TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
JOSHUA O. MAUSNER (Cal. Bar No. 260251)
Assistant United States Attorney
National Security Division
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0619
Facsimile: (213) 894-3713
E-mail: joshua.mausner@usdoj.gov

A. TYSEN DUVA
Assistant Attorney General
Criminal Division
PATRICK JASPERSE (D.C. Bar No. 986804)
Trial Attorney
U.S. Department of Justice
Criminal Division
Human Rights and Special Prosecutions Section
1301 New York Avenue, NW
Washington, DC 20503
Telephone: (202) 616-8917
Email: patrick.jasperse@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SAMIR OUSMAN ALSHEIKH,<br><br>Defendant. | No. CR 24-00483(A)-HDV<br><br><u>GOVERNMENT'S SENTENCING POSITION</u><br><br>Sentencing Date: September 17, 2026<br>Sentencing Time: 1:30 p.m. |

Plaintiff United States of America, by and through its counsel of record, the Attorney General and First Assistant United States

Attorney for the Central District of California, Assistant United States Attorney Joshua O. Mausner, the Assistant Attorney General for the Criminal Division of the Department of Justice, and Department of Justice Trial Attorney Patrick Jasperse, hereby submits its Sentencing Position for defendant Samir Ousman Alsheikh.

This Sentencing Position is based upon the attached memorandum of points and authorities and exhibits attached hereto, the Presentence Investigation Report and United States Probation Office sentencing recommendation letter, victim impact statements (both video and written), trial testimony and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit at the sentencing hearing.

//

//

The government respectfully reserves the right to supplement its sentencing position prior to sentencing, including following any revisions to the Presentence Investigation Report, filing of defendant's sentencing position, or submission of additional materials by victims.

Dated: September 3, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

/s/
JOSHUA O. MAUSNER
Assistant United States Attorney

A. TYSEN DUVA
Assistant Attorney General
Criminal Division

PATRICK JASPERSE
Trial Attorney
U.S. Department of Justice
Criminal Division
Human Rights and Special Prosecutions Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

TABLE OF CONTENTS


DESCRIPTION PAGE

TABLE OF AUTHORITIES....ii

MEMORANDUM OF POINTS AND AUTHORITIES....1

I. INTRODUCTION....1

II. STATEMENT OF FACTS....3

III. THE USPO'S PRESENTENCE INVESTIGATION REPORT AND RECOMMENDATION....5

IV. SENTENCING GUIDELINES ANALYSIS....6

A. The USPO's Guidelines Calculation....6

B. The Kidnapping, Abduction, and Unlawful Restraint Guideline is the Proper Guideline for Defendant's Torture Convictions....7

C. Defense's Alternative Proposed Guidelines Calculation is Incorrect....12

V. THE GOVERNMENT'S SENTENCING RECOMMENDATION....16

A. Nature and Circumstances of the Offense....16

B. Defendant's History and Characteristics....19

C. Seriousness of the Offense, Promoting Respect for the Law, Just Punishment, and Deterrence....24

D. Avoiding Unwarranted Sentencing Disparities....26

VI. VICTIM RESTITUTION....27

VII. SENTENCING HEARING....28

VIII. CONCLUSION....31

TABLE OF AUTHORITIES

DESCRIPTION PAGE

**Cases:**


United States v. Belfast,
611 F.3d 783 (11th Cir. 2010) ................ 11, 12, 13, 14, 15, 26

United States v. Correa,
No. 20-CR-00148-CMA (D. Colo. Aug. 22, 2025) . 11, 13, 14, 15, 25, 27

United States v. Guerrero,
987 F.2d 618 (9th Cir. 1993) .................................. 22

United States v. Moreno,
421 F.3d 1217 (11th Cir. 2005) ............................... 8, 9

United States v. Roggio,
No. 3:18-CR-97, 2024 WL 1661117 (M.D. Pa. Apr. 16, 2024).... 12, 13, 15, 26, 27

United States v. Takahashi,
205 F.3d 1161 (9th Cir. 2000) ................................... 8

United States v. Valdez,
2012 WL 13089923 (D. Alaska Oct. 23, 2012)........................8

United States v. Wei Lin,
841 F.3d 823 (9th Cir. 2016) .................................... 9


**Statutes:**


18 U.S.C. § 2340(1) ............................................. 12

18 U.S.C. § 2340A................................................. 8

18 U.S.C. § 3553(a) ......................................... 16, 21

18 U.S.C. § 3664.................................................. 28

18 U.S.C. § 3771(a)(4) .......................................... 28

18 U.S.C. § 3771(e)(2)(A) ....................................... 28


**Rules:**


USSG § 1B1.1(a)(1) ............................................... 8

USSG § 1B1.2 ........ 8
USSG § 2A2.2(b)(1) ........ 15
USSG § 2A4.1(a) ........ 6
USSG § 2A4.1(b)(2)(A) ........ 6
USSG § 2A4.1(b)(3) ........ 6
USSG § 2A4.1(b)(4)(A) ........ 6
USSG § 2A4.1(b)(7) ........ 12
USSG § 3A1.3 ........ 15
USSG § 3B1.1(a) ........ 6
USSG § 3B1.3 ........ 6

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant Samir Ousman Alsheikh ("defendant") chose to serve the ruthless, repressive Assad regime in Syria throughout his professional life, including for four years as the warden of Syria's largest prison. There, he ordered and participated in the brutal torture of Khaled Abdul Malek, Mokdad Saloukha, Nidal Shikhani, and countless other prisoners. Following his career in service to the Assad regime, he chose to emigrate to the United States, lying repeatedly to United States authorities to gain entry to the United States and to try to gain the benefits of U.S. citizenship.

Defendant was charged with conspiracy to commit torture (Count One), torture (Counts Two through Four), visa fraud (Count Five), and attempted naturalization fraud (Count Six). He received the fair trial that none of his victims ever received and was convicted on all counts. He now deserves a just sentence that takes into account the gravity and severity of his conduct, including the suffering and lasting harm he inflicted on the defenseless men he ordered tortured in Wing 13 of Adra Prison.

The victim impact statements filed with the Court make clear that defendant's victims still bear the physical and mental scars of what he did to them:

> *I still hear the screams of others begging for mercy, repeating, "Leave me, leave me."*
> *–Nidal Shikhani (Ex. 3 at 1)*

> *One cannot imagine the amount of pain and suffering that I endured at that time, and that has stayed with me until today. –Mokdad Saloukha (Ex. 2)*

> *My son Battal asks if he could ride my back and with a heart wrung with pain, I am forced to tell him I [am] no longer strong enough to carry him.*
> *–Khaled Abdul Malek (Ex. 1 at 1)*

> *The arbitrary arrest and torture I endured was not merely a deprivation of liberty, but a process that resulted in complete spiritual crushing. Even though twenty years have passed, I still live in the prison of my memory; I suffer from sudden panic attacks and constant anxiety.*
> *–Sultan Abdul Malek (Ex. 4 at 1)*

> *My family still suffers. My daughter says the fear still haunts us until today. All of us are suffering, still, because of Samir Alsheikh.*
> *–Dr. Kamal Allabwani (Ex. 6 at 2)*

Defendant knew that what he was doing was wrong. Nonetheless he ordered and participated in the torture of his victims because he had the power to do so and because he thought he would never be held accountable. It is now up to this Court to hold defendant accountable. The pain and lasting trauma defendant caused was severe and not limited to the three victims who testified during his trial. He does not deserve the leniency that he asks this Court for now – leniency he failed to grant any of his victims. Nor should he get a sentencing discount because he is 74 years old and purportedly has health problems, or because the torture occurred in another country two decades ago. Defendant chose to misuse his position of authority to unlawfully and brutally torture prisoners under his command. His sentence should be commensurate with the gravity and severity of his conduct.

The government respectfully requests that the Court sentence defendant to no less than 80 years in prison: the 20-year statutory maximum sentence for each of Counts One through Four, to be served consecutively, along with five years in prison for each of Counts

Five and Six, to be served concurrently with each other and the sentences on the torture counts. Anything less would minimize the harm to the victims, fail to recognize the seriousness of the offenses, not afford adequate deterrence to such extreme criminal conduct, and create unwarranted sentencing disparities with other defendants convicted of torture.

## II. STATEMENT OF FACTS

Having presided over the two-week trial in this matter, including the testimony of three of defendant's torture victims, the Court is familiar with the facts, which are also summarized in the Presentence Investigation Report ("PSR").[1] In summary, defendant was in charge of Adra Prison from 2005 to 2008. The prison held about 10,000 prisoners, including those accused of ordinary crimes and those accused of political crimes after speaking out against the Assad regime. Mohamad Ma'moun Alhomsi and Dr. Kamal Allabwani were two high-profile political prisoners housed at Adra under defendant's command. Defendant was singularly focused on these political prisoners. Evidence presented at trial showed that he wanted to know everything about them, in part to ensure they did not do anything that would make him look bad in the eyes of the regime. The evidence also showed that defendant worked to have ordinary prisoners harm political prisoners like Alhomsi and Allabwani, in a way that would not leave the Syrian government's fingerprints on what he had arranged. When two ordinary prisoners refused defendant's orders to harm Alhomsi and Allabwani, and when a third prisoner wrote a letter of support to Allabwani that was intercepted by prison guards,

[1] See PSR ¶¶ 7-29.

defendant ordered these three men forcibly removed from their cells and transferred against their will to Wing 13, Adra's notorious underground torture wing, where they were brutally tortured. Defendant personally tortured one of these men himself.

Following the two-week trial, the jury convicted defendant of conspiracy to commit torture (Count One) and the torture of victims Khaled Abdul Malek (for refusing defendant's orders to harm Alhomsi, Count Two), Mokdad Saloukha (for refusing defendant's orders to harm Allabwani, Count Three), and Nidal Shikhani (for writing a letter of support to Allabwani, Count Four). The victims' testimony about how they were treated in Wing 13 was horrifying. After defendant ordered his victims to be moved from their cells to Wing 13, the victims were hung for hours at a time from their wrists; folded into tires and beaten with pipes, batons, and heavy braided cables; placed in isolation cells with insects and vermin; deprived of food, warmth, and adequate space to stand or sleep; placed on the "Flying Carpet," a device that folded their bodies in half at the waist, shattering their spines; denied medical care; told they were being prepared for summary execution and placed in clothing reserved for those who would be put to death; and subjected to hearing and witnessing the torture of others; among other acts of severe physical and psychological torture ordered by defendant.

In addition to the conspiracy and substantive torture counts, defendant was also found guilty of making false statements on his visa applications (Count Five) and naturalization application (Count Six), for lying and withholding from United States authorities information about his past conduct when he emigrated to the United States and later attempted to become a United States citizen.

As detailed below, defendant's conduct warrants a substantial sentence that reflects the seriousness and gravity of his crimes, acknowledges the permanent physical and psychological harm he has done to countless victims, supports deterrence of such depraved and brutal conduct in the future, and ensures just punishment commensurate with other defendants who have been convicted under the federal torture statute. Defendant should be sentenced to no less than 80 years in custody.

## III. THE USPO'S PRESENTENCE INVESTIGATION REPORT AND RECOMMENDATION

The PSR and sentencing recommendation letter were filed by the United States Probation Office ("USPO") on August 13, 2026. (Dkts. 298 and 299.) The PSR determined that defendant's combined adjusted offense level is 49, which is literally off the charts and therefore treated under the Guidelines as offense level 43, the highest possible offense level. See Chapter 5, Part A, comment note 2. The advisory Guidelines sentence is life in prison, though in this case, the statutory maximum is 100 years in prison (20 years each for Counts One through Four and 10 years each for Counts Five and Six). Therefore, the statutory maximum sentence becomes the advisory Guidelines range – 100 years in prison (PSR ¶ 143.)

Despite a Guidelines sentence of 100 years, the USPO has recommended that the Court sentence defendant to a far below-Guidelines sentence, a one-year term of supervised release, and a special assessment of $600, and that the Court hold a deferred restitution hearing.

The government agrees with the USPO's Guidelines calculations, including its calculation of a Guidelines sentence of 100 years, but

disagrees with its sentencing recommendation, as discussed further below.

## IV. SENTENCING GUIDELINES ANALYSIS

### A. The USPO's Guidelines Calculation

Applying the 2008 Sentencing Guidelines Manual, the USPO found that the following Guidelines apply to the torture-related counts of conviction (Counts One through Four):

| | | |
|---|---|---|
| Base offense level: | 32 | USSG § 2A4.1(a) |
| Victim sustained permanent or life-threatening bodily injury: | +4 | USSG § 2A4.1(b)(2)(A) |
| Defendant used a dangerous weapon: | +2 | USSG § 2A4.1(b)(3) |
| Victim was not released before 30 days had elapsed: | +2 | USSG § 2A4.1(b)(4)(A) |
| Defendant was the organizer or leader of criminal activity that involved five or more participants: | +4 | USSG § 3B1.1(a) |
| Defendant abused a position of trust: | +2 | USSG § 3B1.3 |
| Multiple unit adjustment: | +3 | USSG § 3D1.4 |
| Combined adjusted offense level: | 49 | |
| Total offense level: | 43 | |
| Guidelines sentence | Life | |

The government concurs in this calculation. Defendant objected to the USPO's offense level calculation in a letter sent to the USPO on August 21, 2026. Defendant contends that rather than USSG § 2A4.1 (the kidnapping, abduction, and unlawful restraint base offense level), § 2A2.2 (the aggravated assault offense level) should apply.

As discussed in greater detail below, defendant's proposed alternative sentencing calculations are incorrect.[2]

With respect to the immigration fraud counts of conviction (Counts Five and Six), the PSR correctly calculates the base offense level as 8, pursuant to USSG § 2L2.2(a). However, the PSR fails to include an increase to level 25 for committing the immigration offenses to conceal defendant's participation in a serious human rights offense (USSG § 2L2.2(b)(4)(B)). This enhancement went into effect in 2012, well before defendant committed visa fraud and attempted naturalization fraud in March 2020 and January 2023, respectively. However, because the USPO has used the 2008 Guidelines that were in effect at the time of the torture violations in its application to the immigration fraud calculations, it has excluded this enhancement. The government disagrees with use of the 2008 Guidelines for the immigration fraud offenses that were committed in 2020 and 2023, and respectfully submits that USSG § 2L2.2(b)(4)(B) in the 2012 Guidelines should apply, thereby increasing the offense level for Counts Five and Six to 25.

**B. The Kidnapping, Abduction, and Unlawful Restraint Guideline is the Proper Guideline for Defendant's Torture Convictions**

As noted above, the USPO determined that § 2A4.1 was the appropriate base offense guideline, resulting in an offense level of 43 and a Guidelines sentence of life in prison. Defendant contends that § 2A2.2 is the applicable Guideline, resulting in an offense

[2] As discussed below, in addition to arguing for application of the incorrect base offense level, defendant's proposed calculations also omit various applicable sentencing enhancements in his guidelines calculation.

level of 33 and a much lower Guidelines sentence of 11 to 14 years in prison. Defendant is incorrect.

The first step in calculating a defendant's Guidelines range is determining the section from Chapter Two of the Guidelines Manual that is applicable to the offense of conviction. USSG § 1B1.1(a)(1); see United States v. Takahashi, 205 F.3d 1161, 1166 (9th Cir. 2000). The Manual lists five possible Chapter Two sections for a torture conviction under 18 U.S.C. § 2340A: § 2A1.1 (First Degree Murder); § 2A1.2 (Second Degree Murder); § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder); § 2A2.2 (Aggravated Assault); and § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint). See USSG App. A.

Where, as here, there are multiple sections referenced in Appendix A for the offense of conviction, the Court must "determine which of the referenced guideline sections is *most appropriate* for the offense conduct charged in the count of which the defendant was convicted." USSG § 1B1.2 cmt. n.1 (emphasis added). "[T]he court must determine which of those guidelines is the most applicable under the circumstances of that particular case." Takahashi, 205 F.3d at 1167.[3]

[3] At the time of the Ninth Circuit's decision in Takahashi, the Guidelines said the court should determine "which guideline section applies *based upon the nature of the offense conduct charged* in the count of which the defendant was convicted." Due to conflicting decisions regarding which guideline should apply when certain drug offenses took place near sensitive locations, the Sentencing Commission adopted Amendment 591 that went into effect on November 1, 2000. The revised language states that the court should determine "which of the referenced guideline sections *is most appropriate for the offense conduct charged* in the count of which the defendant was convicted." See generally United States v. Valdez, No. 3:98-CR-00133-JKS, 2012 WL 13089923 (D. Alaska Oct. 23, 2012). Defendant's August 21, 2026, letter to the USPO misquotes United States v. Moreno, 421 F.3d 1217, 1219 (11th Cir. 2005), by adding the words "explicitly clear" to suggest that Amendment 591 is relevant to the analysis in this case. It is not. The change from "based upon the nature of the offense" to "most appropriate" did not change that the selection of

*(footnote cont'd on next page)*

See also United States v. Wei Lin, 841 F.3d 823, 826 (9th Cir. 2016) ("When trying to determine which guideline sections apply to which crimes, a court must naturally look at the offense conduct of the crime.").

Defendant's reliance on United States v. Moreno, an Eleventh Circuit case, for the proposition that this Court cannot look to the evidence presented at trial or make factual determinations based on the record in determining the sentencing guidelines, is incorrect. As Moreno itself plainly states, "In short, Amendment 591 directs the district court to apply the guideline dictated by the statute of conviction, *but does not constrain the use of judicially found facts to select a base offense level within the relevant guidelines*." 421 F.3d 1217, 1219-20 (11th Cir. 2005) (emphasis added).

Regardless, even looking solely at the conduct charged on the face of the First Superseding Indictment, the USPO's determination that § 2A4.1 is the most appropriate guideline is correct. Titled "Kidnapping, Abduction, Unlawful Restraint," § 2A4.1 is the most applicable guideline to defendant's conduct as charged and proved by the evidence at trial. As alleged in the First Superseding Indictment, defendant forcefully and unlawfully moved his victims, against their will, from their cells at Adra Prison to Wing 13, where he unlawfully restrained them as part of his torture methods. Defendant thereby kidnapped and abducted his victims from their lawful prison cells at Adra to his unlawful underground torture

---

the proper guideline should be based on "the offense conduct charged."

facility in Wing 13.[4] As the Guidelines recognize, § 2A4.1 can apply where a kidnapping "occurs as part of or to facilitate the commission of another offense." USSG § 2A4.1, Background. Here, defendant's forceful kidnapping and abduction of his victims to Wing 13 was an integral part of the charged torture conspiracy and an integral part of the method of torture the defendant and his conspirators used to torment the victims.

Additionally, as charged and proved at trial, once in Wing 13, victims were unlawfully restrained as part of defendant's torture routine:

- Defendant was charged with and found guilty in Count One of conspiring to inflict severe physical and mental pain and suffering by sending prisoners to Wing 13, where (a) their hands were bound behind their backs overnight, (b) they were strapped flat on their backs to the Flying Carpet, (c) they were suspended for hours at a time from the ceiling via manacles on each wrist that were attached to a pipe in the ceiling, (d) fastened to a pulley-like device that stretched their arms and legs, and (e) beaten while immobilized in tires. (Dkt. 48, ¶20(a), (f), (g), (h), and (i).)
- Defendant was charged with and found guilty in Count Two of participating in the torture of Khaled Abdul Malek, whose body was forcibly folded together while restrained on the Flying Carpet and who was beaten while suspended from the ceiling. (Id., ¶22.)

---

[4] As this Court has previously determined, torture was unlawful in Syria. See Dkt. 272 at 31, Court's Jury Instruction No. 30: "I instruct you that during the time period relevant to the First Superseding Indictment, torture was illegal under Syrian law."

- Defendant was charged with and found guilty in Count Three of ordering the torture of Mokdad Saloukha, which also included the Flying Carpet, suspension from the ceiling, and being forced to sleep with his hands tied tightly behind his back. (Id., ¶24.)
- Defendant was charged with and found guilty in Count Four of ordering the torture of Nidal Shikhani, whose spine was fractured while tied to the Flying Carpet. (Id., ¶24.)

Both (a) the abduction and movement of victims to Wing 13 against their will and (b) the restraint of the victims while their bodies were forcibly contorted on the Flying Carpet and while they were manacled to ceiling pipes and suspended for hours in excruciating positions were intrinsic to the charged torture conspiracy. Regardless of whether the victims were lawfully confined at Adra Prison in the first place, the victims – on defendant's orders – were subsequently unlawfully abducted and moved to Wing 13, against their will, where they were restrained, confined in solitary cells, and tortured.

Section 2A4.1 has been properly applied by district courts in sentencing two of the three defendants previously convicted of torture in United States courts.[5] In United States v. Belfast, 611 F.3d 783, 824-25 (11th Cir. 2010), the defendant also argued that the aggravated assault guideline, § 2A2.2, should have been used to calculate his sentence. Id. at 801. The Eleventh Circuit rejected that argument, observing that "[t]orture requires, as an element, that the defendant have custody or physical control over the victim."

---

[5] The third case – United States v. Correa – is discussed in greater detail below.

Id. at 825 (citing 18 U.S.C. § 2340(1)). "Kidnapping is one method of obtaining and maintaining custody or physical control over another." Id. As a result, "the application of the kidnapping guideline, which itself recognizes that kidnapping can occur 'during the commission of, or in connection with, another offense,' was entirely proper." Id. (quoting USSG § 2A4.1(b)(7)). Moreover, the Eleventh Circuit stated, "the kidnapping guideline is particularly appropriate in cases of torture, such as this case, where there are repeated, severe physical assaults, and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse." Id. Similarly, in United States v. Roggio, No. 3:18-CR-97, 2024 WL 1661117, at *2-5 (M.D. Pa. Apr. 16, 2024), the district court found § 2A4.1 to be the most appropriate guideline as well.

### C. Defense's Alternative Proposed Guidelines Calculation is Incorrect

Contrary to the USPO's Guidelines calculations, defendant's August 21, 2026, letter proposes an alternative calculation that both uses the incorrect base offense level and fails to include a number of applicable sentencing enhancements. Defendant's attempt to artificially reduce his sentence through his proposed incorrect Guidelines calculation should be rejected.

First, defendant claims that the aggravated assault guideline, § 2A2.2, applies as a starting base offense level, as opposed to the USPO's application of the kidnapping, abduction, and unlawful restraint guidelines, § 2A4.1. Defendant argues that § 2A4.1 cannot be applied because he was not convicted of kidnapping. Under that theory, § 2A2.2, the guideline defendant says should be applied, could not apply either, because defendant was also not convicted of

aggravated assault. The specific statute of conviction is not determinative. As dictated by the Guidelines, the Court must consider and apply the base offense level most applicable based on the conduct defendant was convicted of committing.

Defendant relies entirely on United States v. Correa, No. 20-CR-00148-CMA (D. Colo. Aug. 22, 2025), the only case to apply the aggravated assault guideline to torture, as opposed to the kidnapping, abduction, and unlawful restraint guideline. As the Court in Correa specifically acknowledged, however, the facts in Correa were unlike the facts in the prior torture cases (and, as discussed below, unlike the facts presented in this case):

> The Court finds that several factors distinguish Mr. Correa from the defendants in both Belfast and Roggio. First, both Belfast and Roggio were high-level superiors that ordered the abductions and continued retention of the victims, whereas Mr. Correa was a low-level Private in the Gambian Army. Unlike Belfast and Roggio, Mr. Correa was not the person giving orders to seize or arrest the victims in this case, was not the individual directing their continued detention at Mile 2, nor was he the one giving orders to transport victims to – from Mile 2 to the NIA in the middle of the night to be tortured.
>
> Second, according to the transcript of the district court sentencing hearing in Roggio, the Court found it significant that, quote, a jury found Ross Roggio guilty of counts one and two of the superseding indictment, which in part states, quote, Roggio directed Kurdish soldiers to abduct the victim and detain the victim at a Kurdish military compound for approximately 13 days, and tortured the victim during multiple interrogation sessions led by Roggio, end quote. That’s from 243-2, page 17.
>
> Similarly, in the transcript of the Belfast sentencing hearing, doc 243-1, page 23 and 40, the Government, in support of its argument that kidnapping was the appropriate crime from which to base the offense level, indicates that the indictment alleged and pled that the defendant exercised custody and control over his victim, and that the allegations referred to the seizure and imprisonment and the description of detention as pits in the ground, and description of transportation to unofficial locations.

(Correa Sentencing Transcript at 15-16, Dkt. 274.)

Here, unlike in Correa, defendant was a "high-level superior [who] ordered the abductions and continued detention of the victims." Defendant was the head of Adra Prison, the highest-ranking authority in the prison, and directly ordered the torture of his victims in the prison's illegal underground torture facility. This was specifically alleged in the First Superseding Indictment and proven beyond a reasonable doubt at trial. Defendant was the "one giving orders to transport victims" to Wing 13, as well as the "individual directing their continued detention" away from their imprisonment in their cells at Adra Prison and into Wing 13 where they were unlawfully restrained and "tortured [] during multiple interrogation sessions." The facts that the court distinguished in Correa in refusing to apply the kidnapping, abduction, and unlawful restraint guideline are simply not present here. As the court in Belfast stated, "the kidnapping guideline is particularly appropriate in cases of torture such as this, where there are repeated severe physical assaults and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse." The victims here were forcefully and unlawfully abducted from their cells in Adra Prison. They were moved, at defendant's orders and against their will, to an illegal, underground torture facility, where they were restrained while being beaten, having their spines broken, and otherwise physically and psychologically tortured, repeatedly, and for extended periods of

time. As was the case in Belfast and Roggio, Section 2A4.1 is the most appropriate guideline based on this conduct.[6]

Second, in addition to attempting to start the Guidelines calculation from an incorrect, lower base offense level, defendant's August 21, 2026, letter to the USPO also leaves out several applicable sentencing enhancements that plainly apply to the calculation here. Specifically, a 2-level enhancement for an assault that involved more than minimal planning, pursuant to USSG § 2A2.2(b)(1), and an additional 2-level enhancement for physically restraining the victims, pursuant to USSG § 3A1.3, would also apply. Thus, even assuming application of defendant's proposed lower aggravated assault base offense level, the total offense level would be 34, resulting in a Guidelines range of 210-262 months, not the 135-168 months as calculated in defendant's letter.

Defendant's purported Guidelines calculation is incorrect, both because it applies the incorrect base offense level and because it neglects to include various enhancements that apply. Defendant's proposed alternative Guidelines calculation should be rejected. The guidelines as calculated by the USPO are correct and should be applied by the Court.

---

[6] Despite applying the aggravated assault guideline, rather than the kidnapping, abduction, and unlawful restraint guideline, and calculating a Guidelines range of 135-168 months, the court in Correa nonetheless sentenced defendant to 810 months (67½ years) in custody, which amounted to a nine-level upward departure. In imposing sentence, the court in Correa reasoned: "if we are to remain a civilized society, this kind of illegal, immoral, brutal, and heinous conduct against our fellow human beings cannot be tolerated, and must be severely punished." (Correa Sentencing Transcript at 68.)

## V. THE GOVERNMENT'S SENTENCING RECOMMENDATION

A prison term of 80 years, followed by a three-year period of supervised release, is warranted to achieve the purposes set forth in 18 U.S.C. § 3553(a). Considering the § 3553(a) factors, the sentence the government recommends represents an appropriate sentence given the nature and circumstances of the offense; the history and characteristics of the defendant; the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and adequate deterrence; and to avoid unwarranted sentencing disparities amongst other defendants tried and convicted of torture.

### A. Nature and Circumstances of the Offense

Defendant was convicted of conspiracy to commit torture, and multiple substantive counts of torture, each count representing a victim who testified at trial to the experiences each suffered at Adra Prison at the hands of the defendant. The torture defendant inflicted on these men and others was barbarous and almost unimaginably cruel. Defendant sent prisoners to Wing 13 knowing their bodies and spirits would be broken when folded on the Flying Carpet, suspended from the ceiling for hours or days, savagely beaten while immobilized inside tires, and packed into tiny, filthy, cold, wet cells that were crawling with insects and vermin.

As a result of the notoriety of some of the political prisoners and international pressure in this pre-Syrian civil war era, the Assad regime housed some political dissidents at Adra Prison instead of at even more horrendous military and intelligence service prisons. Defendant was assigned to Adra Prison to keep a lid on those political prisoners and to make their lives as miserable as possible. He carried out his orders with gusto. "Samir Alsheikh did not carry

out torture to extract information, but rather to break a person, and sometimes for his enjoyment," according to Anwar Al Bunni, a political prisoner at Adra (Ex. 5 at 2).

Defendant was so angry at Khaled Abdul Malek for refusing defendant's order to poison Alhomsi, that he personally went to Wing 13 and stomped on the Flying Carpet, folding Abdul Malek's body in half and leaving him in agony and with serious medical issues that persist to this day. As Abdul Malek wrote in his victim impact statement:

> *The defendant and his officers launched a brutal campaign of revenge against me. They subjected me to some of the most horrific acts of torture in the "Flying Carpet" device and Samir Alsheikh personally stomped on me with all his weight while wearing his military boots and cursing me until I lost consciousness. I was hung by my arms for 11 days in the "shabah" (ghost) position until I felt as if my hands were being torn from my wrists and my shoulders separated from my body.* (Ex. 1 at 1.)

Nidal Shikhani wrote that, since Adra,

> *I have lived with constant pain and serious limitations in my ability to move. Simple activities that many people take for granted, walking normally, standing for long periods, or moving without pain, have become difficult. The torture permanently damaged my mobility and physical independence.* (Ex. 3 at 2.)

The suffering defendant meted out was not just physical. As Dr. Kamal Allabwani wrote in his victim impact statement, "General Samir constantly sought to break the political prisoners and force them to surrender by identifying their physical and mental vulnerabilities and ruthlessly exploiting them." (Ex. 6 at 2.) As Mahmoud Eisa wrote in his victim impact statement, "My time at Adra, while Brigadier General Alsheikh was the head of the prison, taught me that prison in Syria was designed so that those who enter do not leave as they

entered. It is designed so that inmates carry its scars for the rest of their lives and are driven away from political activism and concern for public affairs." (Ex. 7 at 2.)

The Court undoubtedly recalls the haunting, agonizing trial testimony of Mokdad Saloukha, whom defendant sent to Wing 13 after Saloukha refused defendant's orders to harm Dr. Allabwani. In his victim impact statement, Saloukha wrote: "I asked God so many times to allow me to die then, so that I would not be forced until now to suffer, cry out, and moan from pain and hopelessness." (Ex. 2 at 1.)

Abdul Malek, Shikhani, and Saloukha were not the only prisoners whom defendant tortured, and at sentencing the Court can take into account conduct within the scope of the torture conspiracy as well as all relevant conduct. Those three witnesses testified at trial about seeing and hearing other prisoners being tortured in Wing 13. Five additional victims have submitted victim impact statements to date: Sultan Abdul Malek (Ex. 4), Anwar Al Bunni (Ex. 5), Dr. Kamal Allabwani (Ex. 6), Mahmoud Eisa (Ex. 7), and Khaled Karam (whose statement was provided to the USPO for inclusion in the PSR, but who did not wish to have his statement made public). Al Bunni, an attorney who initially visited clients at Adra Prison and later became a prisoner himself, wrote that "[p]risoners would return from Wing 13 and tell me about the torture they experienced, but I could also see the evidence of it on their bodies." Eisa said that when he was in Wing 13, he saw "car tires, batons, and other torture devices. I heard the unmistakable screams of prisoners being tortured. I feared for my life."

Khaled Abdul Malek noted that he was not the only one who suffered at the hands of defendant and his co-conspirators:

> *I knew some of the names of those who I witnessed tortured at Adra, but there are many who remain nameless and voiceless. I hope they also receive some semblance of justice because they are unable to speak to this Court themselves.* (Ex. 1 at 3.)

Defendant's torture has had lasting impact, physically and psychologically, on a number of his victims, as well as their families. The serious nature and brutal circumstances of defendant's crimes cannot be overstated. As noted by Anwar Al Bunni in his victim impact statement, "torture is among the most egregious crimes humans can inflict on one another." (Ex. 5 at 3.)

**B. Defendant's History and Characteristics**

Defendant spent his life carrying out the dirty work of the brutal Assad regime. After beginning as a police officer, defendant worked for one of the Syrian security agencies whose mission was to stifle political dissent. In that role, he was involved in the arrest of some of the prisoners who ended up at Adra. Joumana Seif testified at trial about conversations with defendant in which he acknowledged being involved in the arrest of her father, Riad Seif, a former member of the Syrian Parliament and Assad critic who was imprisoned at Adra for many years. Another former prisoner, who did not testify and who does not want to be identified publicly, stated during an interview that defendant was involved in his arrest in 2001. When defendant later became the head of Adra Prison, defendant told the prisoner he could be released if he apologized to President Assad. (Ex. 8 at 1.) As head of Adra Prison, defendant continued to do the bidding of the Assad regime, stifling political dissent and punishing opponents of the regime and those who supported them.

Defendant's service to the Assad regime continued when he was promoted again after his time as head of Adra Prison ended. After the

Syrian civil war began in 2011, Bashar al-Assad appointed defendant as the governor of Deir Ez-Zour, an important, oil-rich province in Syria where protests in opposition to the regime had recently begun. During defendant's year as governor, the Syrian government violently suppressed peaceful demonstrations in Deir Ez-Zour against the Assad regime. (PSR ¶ 8). Defendant became the governor of Deir Ez-Zour in mid-July 2011, and news media reports at the time documented the killing of protesters there. See Ex. 9 at 2 (Arabic news organization reporting that more than 15 protesters had been killed and 60 injured in Deir Ez-Zour in late July 2011); Ex. 10 (BBC article reporting shelling and killing of 17 protesters in Deir Ez-Zour, spelled "Dayr al-Zawr" in the article, in August 2011).

In addition, a September 2011 internal memo from the Political Security Branch of Deir Ez-Zour (part of the same internal intelligence agency where defendant worked in Damascus before becoming the head of Adra Prison) describes defendant supervising the activity of security personnel in Deir Ez-Zour and praising "their excellent work" after they had "shot to disperse civilians" during an operation to arrest demonstrators, killing a woman and wounding a 10-year-old child in the process. See Ex. 11. This document, which was produced to the defense during pre-trial discovery, was provided to the government by the Commission for International Justice and Accountability, an organization that has gathered millions of documents and witness statements from Syria during the Assad regime. Tellingly, near the end of his tenure as governor, defendant was quoted in an article about Deir Ez-Zour in The Christian Science Monitor in June 2012 as saying that "[t]he government has been far too patient with these people". See Ex. 12 at 2-3.

The USPO’s below-Guidelines sentencing recommendation is based in part on the flawed premise that defendant has not engaged in violence since the charged conduct. (Dkt. 298 at 5.) His record as the governor of Deir Ez-Zour shows that this is simply not the case. Moreover, defendant spent the entirety of his career, including in high-ranking positions, working for the Assad regime, which had detained and abused thousands of political prisoners even before the civil war that killed hundreds of thousands of people.

Defendant’s upbringing and education make the conduct for which he was charged and convicted even more egregious. Unlike other defendants who surely have appeared before this Court at sentencing, defendant did not experience a difficult upbringing that provided him little opportunity, making a choice to engage in criminal conduct tempting. He reported to the USPO that he was raised in a “simple and close-knit” family, “with community members relying on one another.” (PSR ¶ 111.) His upbringing “instilled in him the importance of self-reliance, hard work, family, and helping others.” (Id.) He reported “his upbringing as financially modest but reported that his basic needs were met and that he was surrounded by a large and supportive extended family.” (PSR ¶ 112.) He was educated, including receiving a law degree from Damascus University. (PSR ¶ 128.) Despite these opportunities, defendant nonetheless chose to spend his career in service to a brutal regime. He chose to accept a series of promotions into increasingly high-level positions within that regime. And he chose to order and participate in torture while holding these high-level positions, not as a means of survival but as a way to gain more power and influence within this brutal regime. He knew his actions were both illegal and immoral. He was not reacting to

desperation or necessity, was not coerced, and was not an underling simply following orders. As head of the prison, he gave the orders. He is not entitled to any leniency on the basis of the choices he made that have led him to sentencing before this Court.

Nor is defendant due any leniency based on his age, his health, his difficulty in communicating with others due to a language barrier, or other facts the defense has argued warrant a reduced sentence. His claimed health issues are not extraordinary such that they cannot be treated by the Bureau of Prisons. See, e.g., United States v. Guerrero, 987 F.2d 618, 621 (9th Cir. 1993) (finding no "extraordinary physical impairment" warranting reduction of sentence where the Bureau of Prisons could provide care). Defendant has not established any such extraordinary impairment, nor that he is unable to receive adequate care from the Bureau of Prisons for any such impairment.

In fact, medical staff at the Metropolitan Detention Center ("MDC") have continuously assessed and addressed defendant's health concerns while he has been detained there since July 2024. The Health Services Administrator at MDC, after reviewing defendant's medical records, determined that defendant's medical conditions are not unusual in the BOP system and stated that the BOP can provide him with appropriate medical care and treatment. Ex. 13, ¶¶ 4-6, 19-20.[7]

---

[7] Defendant has summited, under seal, a declaration from a former Bureau of Prisons medical official, which purports to make recommendations as to defendant's care. Notably, the declaration does not opine or conclude that the Bureau of Prisons is incapable of providing such care, only that defendant's conditions raise "concern" that defendant will receive care "without clinically significant delay." Turner-Foster Decl. at ¶ 85. This speculative "concern" is insufficient and unpersuasive to warrant any deviation from the substantial sentence warranted by defendant's conduct in this case.

Defendant himself has praised the medical care he has received from the BOP. Just two months after the defense described defendant to Magistrate Judge Donahue as "an elderly man in chronic pain . . . who needs ongoing treatment to deal with mobility issues and to monitor serious medical conditions" (Dkt. 30 at 4), defendant himself told his children on a recorded jail call that "I sleep, I exercise, I get physical therapy here, for my back . . . everything is going ok."[8] Defendant added during another call two days later that: "Everything is great, I have gone three months without smoking, my chest feels better . . . I have a group of people, we hang out, play chess together, and I give them exercises to do. There's a group of 12 people who all exercise together, they're my 'patients' . . . I lost 13 kilograms here, 27 or 28 pounds, it's a great thing . . . I am very comfortable . . . I lost ten pounds in the first month just by cutting out rice and bread." Eight months later, in June 2025, defendant returned from a medical appointment and told one of his children on a recorded call that the Bureau of Prisons dentist who treated him "was the best doctor I've ever seen in my life . . . There's no pain, or anything." On another occasion, defendant described in detail how Bureau of Prisons medical staff arranged for his transportation to a hospital so he could be examined by a specialist.

Ironically, after refusing medical care for inmates under his custody whose injuries he caused, defendant now attempts to use his own supposed need for medical care to elicit sympathy from the Court.

---

[8] These calls were recorded by the Bureau of Prisons, obtained by the government, and produced in discovery to the defense in their original Arabic. The excerpts quoted here are English translations of the calls.

Defendant’s experience in custody, by his own admission, has been far more pleasant than that of the prisoners under his command at Adra. He has not experienced any torture or other mistreatment, appears to be able to communicate just fine with others, and has received more than adequate medical treatment during the entirety of his detention. Defendant has not identified any extraordinary medical impairment that cannot be treated by the Bureau of Prisons to warrant a downward departure or otherwise justify a reduced sentence.[9]

### C. Seriousness of the Offense, Promoting Respect for the Law, Just Punishment, and Deterrence

A substantial sentence is necessary in this case to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter such conduct by others. When it comes to these § 3553(a) sentencing factors, the voices of the victims are the most powerful:

> *I have been transformed from an ambitious and vibrant young man into a survivor constantly battling deep-seated physical and psychological scars. Being a victim has meant a life sentence of collective trauma for my entire family: we have lost our homeland, our financial security, and our peace of mind. –Khaled Abdul Malek* (Ex. 1 at 2)

> *No decision of this Court can restore my health or give me back the life I once had nineteen years ago. I understand that torture is a crime which has no exception justifying its use under international law. As a victim, and someone who has helped thousands of Syrian victims, I understand why. The torturer aims to deprive the victim of dignity and to silence the survivors. Torture irreparably violates the whole person, turning the body against itself. That violation stays with you the rest of your life.*
> *–Nidal Shikhani* (Ex. 3 at 2)

[9] The neuropsychological evaluation the defense provided to the USPO does not indicate that defendant needs extraordinary treatment nor treatment the BOP cannot provide.

> *Everything reminds me of those days. I can hardly forget them for a moment before I find myself back in them again.*
> *–Sultan Abdul Malek* (Ex. 4 at 2)

> *Your Honor, this sentence will send a message to all victims of torture—today and forever—that torture is among the most egregious crimes humans can inflict on one another.*
> *–Anwar Al Bunni* (Ex. 5 at 3)

> *Your honor, I ask that you impose the maximum sentence permitted under the law. We need this message now just as urgently as we needed it then: the torture of one individual is the torture of an entire family, and it keeps all of us in a state of oppression. I testify today from Sweden, but I am still haunted by what happened to me close to two decades ago. That is the harm Samir Alsheikh caused.*
> *–Dr. Kamal Allabwani* (Ex. 6 at 2)

> *My time at Adra, while Brigadier General Alsheikh* was *the head of the prison, taught me that prison in Syria was designed so that those who enter do not leave as they entered. It is designed so that inmates carry its scars for the rest of their lives and are driven away from political activism and concern for public affairs.*
> *–Mahmoud Eisa* (Ex. 7 at 2)

As the court in Correa reasoned when sentencing the defendant to 67½ years in prison, "if we are to remain a civilized society, this kind of illegal, immoral, brutal, and heinous conduct against our fellow human beings cannot be tolerated, and must be severely punished." (Correa Sentencing Transcript at 68.) Defendant's conduct here similarly warrants a significant sentence both to reflect the seriousness of his conduct and the impact it has had on his victims, as well as to deter such conduct by others in the future. This Court's sentence must make clear that torture is a heinous, brutal act that is entirely unacceptable, and that the United States is not a haven for violent human rights abusers.

**D. Avoiding Unwarranted Sentencing Disparities**

Defendant was the fourth person to be convicted of torture since the federal statute went into effect in 1994. The previous defendants were sentenced, respectively, to 97 years in prison, 70 years in prison, and 67½ years in prison. In addition to reflecting the seriousness of defendant's conduct and its impact on his victims, the government's recommended 80-year prison sentence would also be commensurate with the previous torture sentences and would avoid unwarranted sentencing disparities:

- Roy M. Belfast, also known as "Chuckie Taylor," was sentenced in 2009 to 97 years in prison. Case No. 06-20758, S.D. Fla. (Dkt. 618). Belfast was convicted of conspiracy to commit torture, five counts of torture, and two firearms-related offenses. He was sentenced to the statutory maximum of 20 years in prison for the conspiracy to commit torture count, 10 years for each of the five torture counts (a total of 70 years for the torture charges), and a total of 27 years for the firearms convictions. His conviction and sentence were upheld by the Eleventh Circuit Court of Appeals. See United States v. Belfast, 611 F.3d 783 (11th Cir. 2010).
- Ross Roggio was sentenced in 2024 to 70 years in prison. Case No. 18-CR-00097, M.D. Pa. (Dkt. 367). Roggio was convicted of conspiracy to commit torture, one count of torture, and 31 counts related to his illegal exportation of firearm components to Iraq. He was sentenced to the statutory maximum of 20 years on each of the torture counts, with those counts to be served concurrently with each other and consecutively with the collective 50 years in prison on the other counts.

His appeal is pending before the Third Circuit Court of Appeals.

- Michael Sang Correa was sentenced in 2025 to 67½ years in prison. Case No. 20-CR-148, D. Colo. (Dkt. 256.) Correa was convicted of conspiracy to commit torture and five counts of torture. He was sentenced to 135 months on each count, to be served consecutively. His appeal is pending before the Tenth Circuit Court of Appeals.

In its recommendation for a below-Guidelines sentence, the USPO does not explain why defendant in this case should receive a sentence that would be more than 50 years less than the lowest sentence imposed in any of the prior torture cases. That recommendation is plainly inadequate and fails to grasp the severity of defendant's crimes.[10] Pursuant to the 3553(a) factors, defendant's sentence should be commensurate with other defendants who have been convicted under the federal torture statute. The government's recommendation of 80 years is appropriate under the 3553(a) factors and avoids a massive and unjustified disparity with other torture sentences.

## VI. VICTIM RESTITUTION

Pursuant to the Crime Victims' Rights Act, defendant's victims are entitled to restitution. The government requests a deferred restitution hearing within 90 days of sentencing, pursuant to 18 U.S.C. § 3664, to allow additional time to determine restitution owed to victims.

---

[10] Nor does the defendant's advanced age, a factor the USPO cites in its sentence recommendation, justify such a grossly disparate and minimal sentence. The sentences imposed in each of the three prior torture cases extended beyond the anticipated life expectancy of each of those defendants.

**VII. SENTENCING HEARING**

At the sentencing hearing, the government intends to play video victim impact statements recorded by Anwar Al Bunni, Dr. Kamal Allabwani, and Mahmoud Eisa. The Court has not previously heard from these individuals, but they are victims, as defined by 18 U.S.C. § 3771(e)(2)(A). Under the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(4), victims have the right to be reasonably heard at sentencing. Each video is approximately eight minutes in length. Pursuant to the Court's standing order, the videos and English translations were provided to the defense and the USPO three weeks prior to the sentencing hearing. The translations are also attached here as Exhibits 5-7. In addition, the government reserves the right to read into the record the written victim impact statements that are attached here as Exhibits 1-4 and any additional impact statements that are received before the sentencing hearing.

The defense appears to be planning a lengthy presentation at the sentencing hearing.[11] To date, the defense has provided the government with nine videos that it wishes to play at the hearing. These videos last, in total, approximately 52 minutes and would be in addition to any in-person statements the defense intends to present at the hearing, as well as the time required for argument regarding the Guidelines and the 3553(a) factors.

The nine defense videos are from three family members, one family friend, two purported former Adra prisoners, and three

[11] Government counsel from Washington, D.C., is not available on September 18, 2026. If there is any possibility that the hearing, scheduled to begin at 1:30 p.m. on September 17, will not be completed that day and the Court's schedule allows, the government is available to begin the hearing earlier in the day.

acquaintances of defendant. The latter five statements resemble the trial testimony of defense witnesses who had limited contact with defendant, spent little time at Adra Prison, and never ventured into Wing 13, yet felt qualified to make sweeping statements about defendant's treatment of all of Adra's thousands of prisoners during his four-year tenure there. The jury rejected that trial testimony in reaching its verdict. In rendering its sentence, the Court should likewise view these statements, which were not made under oath and will not be subjected to cross-examination, within their proper context.

For the Court's background, the government notes the following with respect to some of the sentencing videos defendant intends to play at sentencing:

- Dr. Safir Ahmad Al-Jarad was on the defense witness list, traveled (at U.S. taxpayer expense) to Los Angeles from the Middle East for trial, and was present in the courtroom, but was not called as a witness. In his sentencing statement, Al-Jarad does not mention that he was a potential defense witness, but states that he "learned, as many have learned, about the case of Samir Al-Sheikh in America." In his statement, Al-Jarad states that defendant's primary goal as the governor of Deir Ez-Zour was "to reject violence and extremism." Al-Jarad himself, however, has celebrated violence and extremism. In October 2016, Al-Jarad celebrated the one-year anniversary of "the blessed Jerusalem uprising" that "terrified and surprised the Zionist entity." <u>See</u> Ex. 14 at 2. The uprising to which Al-Jarad referred was also known as the "Knife Intifada," a campaign of violence against

Israeli citizens that began in the fall of 2015 and ultimately resulted in the deaths of dozens of Israelis and hundreds of Palestinians.[12]

- Ahmad Toumeh was among a group of about a dozen political activists who were arrested in late 2007 and imprisoned at Adra. Two other members of this group, Talal Abou Dan and Jaber Al-Shoufi, testified for the defense at trial. Toumeh claims that the prisoners were treated well, in contrast to Human Rights Watch reports at the time that said that some of the prisoners were subjected to harsh conditions at Adra, including lack of mattresses, lack of medical treatment, and physical violence. See Exs. 15 and 16.
- Ali Al-Farousi was an attorney who says he met with defendant at Adra "on numerous occasions" and Bishop Hanna Jallouf was a cleric who says he visited defendant "several times at the prison." As the Court knows from the cross-examination of defense witnesses at trial, visitors to Adra never got past the front offices and certainly never made it into Wing 13. Uninformed conclusions by such individuals about how defendant "showed compassion toward all prisoners" (Al-Farousi) and "treated everyone with humanity" (Jallouf) are inconsistent with the evidence presented at trial that resulted in the guilty verdict.

---

[12] See https://www.france24.com/en/20160506-reporter-israel-knife-intifada-palestinian-territories-violence; https://www.cfr.org/education/learn/timelines/israeli-palestinian-conflict-timeline (September 2015); https://www.theguardian.com/world/2015/oct/18/knife-intifada-palestinian-israel-west-bank.

- Mahmoud Ammar states that he was detained at Adra Prison in December 1993, "sentenced to several years in prison," and later released. His glowing evaluation of defendant is curious, in light of the fact that defendant was the warden of Adra Prison a decade later, from 2005 to 2008. Ammar's assertion that "[t]here were warm and respectful relations between the prisoners and police officers" at Adra is similarly curious in light of the trial testimony of multiple witnesses that inmates were so frustrated with their treatment during defendant's reign as head of the prison that they staged an uprising that was violently put down by defendant with assistance from the Syrian military.

## VIII. CONCLUSION

Defendant showed no mercy to his victims at Adra Prison. He does not deserve leniency from this Court now.

The Guidelines sentence for defendant's torture offenses is life in prison. Each torture count reflects actual victims whose lives, and the lives of their families, were changed tragically and irreparably by defendant's brazen conduct. The government recommends the statutory maximum sentence of 20 years for each of Counts One through Four, to be served consecutively.

The Guidelines sentence for defendant's immigration fraud offenses should be 57 to 64 months in prison, based on a base offense level of 8 (U.S.S.G. § 2L2.2(a)) and an increase to level 25 for committing the immigration offenses to conceal his participation in a serious human rights offense (U.S.S.G. § 2L2.2(b)(4)(B)). The government recommends a sentence of 60 months each for Counts Five

and Six, to be served concurrently with each other and with the sentences for Counts One through Four.[13]

In sum, the government asks the Court to take into account the seriousness of defendant's conduct, recognize the depravity he showed his victims, and ensure that defendant's punishment fits his crimes. Defendant should be sentenced to no less than 80 years in prison.

[13] The government's recommendation of a sentence within the Guidelines for the immigration counts might be different in a case in which there are not also torture counts.

# EXHIBIT 1

**Khaled Abdul Malek**
**Victim Impact Statement**

To the Honorable Court, Your Honor,

My name is Khaled Abdul Malek, and I am identified as torture Victim #1 in this case. I was detained and tortured at Adra Prison by Samir Ousman Alsheikh. I was detained at Adra Prison at the end of 2004. During my detention and torture, I lost the most important parts of my life—my health, my family, and my home.

After serving as a noncommissioned police officer in Lattakia, Syria for nearly a decade, I was arrested and transferred to Adra Prison under the command of Samir Alsheikh. While there, I worked as a supervisor and head of the hospital wing. I was detained at Adra for four years and was taken to Wing 13 twice. Each time, Samir Alsheikh and his men tortured me and held me in solitary confinement.

The defendant and his officers launched a brutal campaign of revenge against me. They subjected me to some of the most horrific acts of torture in the "Flying Carpet" device and Samir Alsheikh personally stomped on me with all his weight while wearing his military boots and cursing me until I lost consciousness. I was hung by my arms for 11 days in the "*shabah*" (ghost) position until I felt as if my hands were being torn from my wrists and my shoulders separated from my body. I began to lose my mind from sleep exhaustion, systemic beatings and starvation.

During my confinement, I spent my days dreaming of my life, my family and my children. I saw dreams of freedom. I had this recurring dream of flying and that I would reach somewhere, anywhere, and from there I would fly away. I spent hours thinking about my children, about life outside, about family, but mostly about freedom. My mental health suffered greatly in solitary confinement. I found myself, like Prophet Yunus (Jonah) when he woke up in the belly of the whale, in the "graveyard of the living." It was not life, it was a slow death. My cell was cold, and dark, and infested with rats, mold, lice and cockroaches. I suffered from the relentless itching of scabies and was served food through a small hole as though I wasn't human.

While I was detained in his prison, Samir Alsheikh sought to destroy my livelihood outside, by filing false reports and draining my family savings. They put enormous pressure on me and forced me, while blindfolded, to sign official documents whose contents I did not know, and I remain unaware of their contents to this day. He also deprived me of the right to a one-quarter reduction in my prison sentence and prevented me from continuing my university education as I was a first-year student in the Faculty of Sharia at the University of Damascus. I spent years paying corrupt officials for a chance to appeal the malicious verdicts against me, Meanwhile Samir Alsheikh continued to profit from this corrupt system. We had to sell everything we had.

This incident has completely devastated my life and shattered my family's stability. My life in Syria before my arrest was beautiful and full. I had everything you could ask for. I lived with my family, my wife and two children, on a farm in the mountains with so many fruit trees. My children were six and three when I was arrested. I built two businesses—one trading cars, the other in the falconry trade. I was athletic and in excellent physical shape. I spent my time horseback riding, hunting, and competing in Taekwondo. I have been transformed from an ambitious and vibrant young man into a survivor constantly battling deep-seated physical and psychological scars.

Being a victim has meant a life sentence of collective trauma for my entire family: we have lost our homeland, our financial security, and our peace of mind. During one visit, Samir Alsheikh and his men tortured and humiliated my brothers, Sultan and Rakkan, as a pressure tactic against me. They called my mother to say they were going to send Sultan to the execution yard, further terrorizing and traumatizing our already sick mother. Witnessing the suffering of my brother Sultan and knowing that our family has been structurally torn apart by this systematic cruelty is a heavy burden we bear every day. My family back home live in fear of retaliation from Samir Alsheikh's family. Both of my parents became sick with cancer while I was in prison; my family hid this from me to try to protect me. They died not long after I was released.

My children also lived under constant humiliation while I was detained. The schools would publicly shame the children of parents in detention. My children were bullied and discriminated against in school. By the time I was released from prison, I missed the formative years of their childhood. They were deprived of my love, care, and attention. I counted all the holidays I missed out on with them—26 Eid (Islamic) holidays and 13 New Years'. I missed 13 of the most important years of their lives. They were eventually forced to flee to Germany. My wife and I divorced because I was detained for so long; it was too much for her. I have since remarried and had three additional children.

The horrific and systematic torture I endured under the direct command of Samir Alsheikh, whilst in Adra Prison, has left me with permanent and irreparable physical injuries. Today, I suffer from chronic and persistent pain in my spine and back, forcing me to use a medical crutch and a walking frame to assist my mobility. This has left me unable to work, exercise, and even drive. Specifically, the brutal use of the "Flying Carpet" device and the suspension by my wrists for days on end ("Shabah") from heating pipes and metal mesh caused severe damage to my skeletal structure and joints. As a direct result of the physical trauma and prolonged severe stress inflicted by the defendant, I require ongoing medical monitoring and lifelong medical examinations of my spine and bones. My son Battal asks if he could ride my back and with a heart wrung with pain, I am forced to tell him I no longer strong enough to carry him.

The psychological harm inflicted upon me is profound and catastrophic. I suffer from chronic and acute post-traumatic stress disorder, severe clinical depression, and recurrent panic attacks. This psychological torment is exacerbated by memories of the atrocities I

witnessed, including Samir Alsheikh personally torturing other vulnerable detainees, and the death of an elderly detainee who suffocated from the tear gas during the January 2007 raid. To manage this prolonged trauma, I have undergone fifty sessions of intensive psychotherapy at Saarland University in Saarbrücken, Germany. I still require ongoing clinical care from two licensed psychiatrists and a neurologist in the United States. I struggle to sleep without medication and certain sounds still terrify me when I hear them, such as the sounds of iron locks or police sirens. To this day, I continue to wake up with the fear that my legs and hands have been ripped off my body.

My permanent physical disabilities and severe psychological conditions have severely affected my ability to carry out daily functions and damaged my cognitive abilities, leading to a sharp and permanent reduction in my career prospects, a lifetime loss of potential earnings, and a state of permanent economic instability. These things are a daily and painful physical manifestation and reminder of Samir Alsheikh's cruelty.

I currently reside in Germany as a refugee and have reunited with my children. However, during this time, two of my brothers, Youssef and Yahya were disappeared 14 years ago. My family and I have not been able to locate them or any information about their disappearance. The longer I'm forced to stay away from my home, the longer we must wait for answers.

I was not the only one who suffered at Adra at the hands of Samir Alsheikh and his men. As I was dragged in and out of the interrogation room in Wing 13, I witnessed appalling atrocities. I witnessed other detainees being tortured in the "Flying Carpet," others tortured with electric shocks and cold water in winter, and the brutal rape committed with a police baton by Colonel Ziad Debo Bakro against the Saudi detainee Khalid al-Shammari, in addition to the torture of another Saudi detainee named Abu Abdulrahman. As the supervisor of the hospital ward, I also treated some of the most horrific torture wounds of my fellow detainees. I knew some of the names of those who I witnessed tortured at Adra, but there are many who remain nameless and voiceless. I hope they also receive some semblance of justice because they are unable to speak to this Court themselves.

Furthermore, Your Honor, ever since I have testified in this case, I have been subject to constant threats, harassment and defamation from anonymous numbers and fake accounts in an attempt to intimate and silence me.

I am deeply grateful to the U.S. Department of Justice and the federal justice system for ensuring that international human rights violators are held to account. The knowledge that this man lied to the U.S. immigration authorities to live a safe and comfortable life in Los Angeles, whilst his victims live with permanent scars, disabilities, and disfigurements, has been a glaring and unbearable injustice.

I respectfully request that the Court impose the absolute maximum statutory penalty provided for by law: Samir Alsheikh has shown no remorse for his atrocities. Imposing the

maximum sentence is of the utmost importance in sending a clear message that the United States will never be a haven for perpetrators of torture and crimes against humanity.

Thank you,
Khaled Abdul Malek

# EXHIBIT 2

**Victim Impact Statement of Mokdad Saloukha**

سيدي القاضي، السيد Alison

انا مقداد سلوخة، وقد مثلت أمامكم قبل أيام للإدلاء بشهادتي ضد المتهم سمير الشيخ، المدير السابق لسجن عدرا المركزي. أدليت بشهادتي حول ما حدث لي قبل عشرين عامًا، ولا يمكن لأحد أن يتخيل حجم المعاناة والألم اللذين تحملتهما آنذاك، واللذين ما زالا يرافقانني حتى اليوم. سيدي القاضي، ما أشدّ صعوبة سماع وقع أقدام تقترب من الزنزانة، وأنا أعلم أن بابها سيُفتح قريبًا، وسأُقتاد منها لأُعذّب. كم دعوت الله أن يرزقني الموت في الحال، كي لا أضطر بعد الآن إلى المعاناة والصراخ والأنين من الألم والعذاب واليأس. والآن أقف أمامكم، وقد تحققت العدالة، أطالب بتعويض مالي عن كل ما حدث لي في ذلك المكان المظلم. لعل هذا أقل حقوقي، و في كل الأحوال القرار لكم، سيدي القاضي.

شكرا لكم من القلب

ووفقكم الله لنصرة المظلومين

**Translated into English by the Government**

Your Honor, Ms. Alison

I am Mokdad Saloukha, and I appeared before you days ago to testify against the defendant Samir Alsheikh, the former head of Adra Central Prison. I testified about what had happened to me twenty years ago- one cannot imagine the amount of pain and suffering that I endured at that time, and that has stayed with me until today. Your Honor, it was so intensely hard for me to hear footsteps approaching the cell, knowing that the door would soon open, and that I would be taken to be tortured. I asked God so many times to allow me to die then, so that I would not be forced until now to suffer, cry out, and moan from pain and hopelessness. I stand before you now, after justice has been done, and request financial compensation for everything that has happened to me in that oppressive place. Perhaps this is the least of my rights, but in any case, that decision is yours, Your Honor.

Thank you from the heart.

And may God help you in championing the oppressed.

# EXHIBIT 3

**Mohamed Nidal Shikhani**
**Victim Impact Statement**

Your Honor,

My name is Mohamed Nidal Shikhani. I present this statement as a survivor of torture whose life was permanently damaged by the torture inflicted upon me nineteen years ago under Samir Ousman Alsheikh's command. Since I left Syria, and because of my experiences, I have dedicated myself to supporting victims and promoting justice. Through my work, I have contributed to exposing war crimes, advocating against the use of chemical weapons against anyone, and investigating and addressing ISIS-related atrocities. For many years, I stood beside other victims and helped them tell their stories. Today, I find myself standing here as one of those victims.

I am identified as Victim #4 in the indictment. In 2007, while returning from Lebanon to Syria to obtain records for my newborn daughter, Louna, I was arbitrarily arrested by the Syrian security services and sent to Adra Prison. Unlike the defendant, I was denied a fair trial and due process.

Before my arrest, I ran a sports club and only wanted to be a coach. I was passionate about introducing the next generation to the mental and physical benefits of sports. The suffering inflicted upon me in Alsheikh's Adra left me with physical and psychological disabilities that may stay with me for the rest of my life, permanently changing my life path and making that dream impossible.

While in Adra Prison under the command of prison director Samir Alsheikh, I was subjected to repeated physical and psychological torture. During one session, my body was forced onto a device known as the "Flying Carpet." During that torture, my spine was severely damaged. The injury never fully healed, and its consequences remain with me to this day.

The conditions in Wing 13 were designed to psychologically torture you. I was placed in a cell with three to four people. We were so close together in our cell that we were forced to take turns leaning against each other to get rest and always giving priority to the person who had just returned from being tortured. The cells were filthy and infested with insects. I shared cells even with those condemned to death, listening to them cry all the time.

I myself was placed in one of these red-orange execution uniforms, taken to the underground dungeon of Wing 13, and told to "get ready." I still hear the screams of others begging for mercy, repeating, "Leave me, leave me." For more than 10 years, I suffered from nightmares about these torturous scenes.

In Wing 13's solitary confinement cells, I suffered the worst days of my life. I was beaten so severely that I could not stand. My spine was crushed and permanently damaged in the "Flying Carpet." In those moments, I feared for my life.

In Wing 13, Samir Alsheikh created conditions of life so unbearable that we were all made to fear for our lives continuously. There were nights when all I heard were the screams of other people begging for mercy. Every day, I feared I would be tortured and killed. Guards tortured other prisoners in front of us. The unending screams of others being tortured were part of the environment of psychological torture. Guards would drag prisoners out of their cells for all of us to witness. I saw victims suspended from water pipes and others brought to what we called execution square and brought before a noose in red-orange jumpsuits. Samir Alsheikh presided over executions.

Since, I have lived with constant pain and serious limitations in my ability to move. Simple activities that many people take for granted, walking normally, standing for long periods, or moving without pain, have become difficult. The torture permanently damaged my mobility and physical independence.

In my daily life, I feel the restrictions clearly and continuously. Even simple tasks, such as walking short distances, climbing stairs, standing for long periods, or carrying light objects, cause severe pain and exhaustion. Sometimes I need assistance or must perform tasks with extra caution, which impacts my independence and freedom of movement permanently. Tasks that were once simple now require effort, caution, and sometimes assistance. The physical damage caused by my torture has changed how I live every single day. Even after many years, the psychological impact remains. Memories of detention, humiliation, and violence do not simply disappear with time.

The seriousness of my condition has been officially recognized by the Belgian Ministry of Health. After medical evaluation, I have been classified as having a disability exceeding 66%, with an assessment of 12 points out of 18 under the national disability evaluation system. This reflects the permanent physical injuries I suffered because of the torture.

Appearing before this Court has required me to revisit some of the most painful memories of my life. I felt it was my responsibility to appear, despite the difficulty, to face the facts and tell the truth. I did not come seeking revenge. I came because accountability matters. When torture is acknowledged and addressed in a court of law, it sends a message that such crimes and the lasting harm on the victims and our families do not simply disappear with time. The cost stays with us.

Nineteen years have passed since these events. Time has not erased their impact on my body or my life. But the fact that this Court is willing to hear the truth, even after so many years, means a great deal not only to me but to many survivors who believed their suffering might never be acknowledged.

No decision of this Court can restore my health or give me back the life I once had nineteen years ago. I understand that torture is a crime which has no exception justifying its use under international law. As a victim, and someone who has helped thousands of Syrian victims, I understand why.
The torturer aims to deprive the victim of dignity and to silence the survivors. Torture irreparably violates the whole person, turning the body against itself. That violation stays with you the rest of your life.

As a Syrian, and someone who has documented horrific crimes for more than 15 years, I can tell you that power can be abused by all who hold power. Only law and independent courts can protect future victims.

Your Honor, let your sentence be heard by all those in power: torture must not be tolerated.

But justice can recognize what happened and affirm that those responsible for torture, including Samir Alsheikh, must be held accountable. For survivors like me, being heard in a court of law is not only about the past, it is about dignity. It is about affirming that even after many years, the truth still matters and the suffering of victims cannot be ignored.
Thank you, Your Honor, for overseeing a fair trial, allowing us, the victims, to participate with the dignity and make our voices heard, and for affirming that the truth cannot be buried. I ask that the court grant the maximum sentence for the crimes committed against me and others. Thank you on behalf of countless survivors who feared their suffering might never be acknowledged.

Respectfully,

Mohamed Nidal Shikhani

# EXHIBIT 4

**Sultan Abdul Malek**
**Victim Impact Statement**

To the Honorable Court,

I begin with the highest expressions of gratitude and appreciation to Your Honor. I humbly express my appreciation for this fair Court, which has spared no effort in pursuing criminals and upholding the truth in accordance with the highest international standards of integrity.

What has restored my spirit and made me feel as if I am reborn is this justice, accountability, and trial of the person I thought had escaped—he and others like him—for their oppression and evil, so that this day may be a living embodiment of justice that does not fade with the passage of time.

The arbitrary arrest and torture I endured was not merely a deprivation of liberty, but a process that resulted in complete spiritual crushing. Even though twenty years have passed, I still live in the prison of my memory; I suffer from sudden panic attacks and constant anxiety.

When my brother, Khaled Abdul Malik, was initially detained in Adra Prison, our communication was semi-daily and visits were held every three days. After a communication blackout of approximately 15 days between us and our brother, we felt anxious, I decided to go visit him to make sure he was okay and to reassure my parents, without knowing what the news was. And I wish I had known that in Syria, there are people more powerful than the law and more powerful than those who make the law, where, even if you have done nothing, you are not safe, because the very person who is supposed to protect you is the one who oppresses and harms you. At that time, I was treated strangely and then detained in a cell for two weeks before that person they call "The Teacher" came to visit me. The thugs working for him and everyone in the prison feared him. So how could I not fear him when everyone else does?

In a moment of silence so thick you could almost hear your own heartbeat; the silence was broken by the clang of doors opening and the jingle of shackles as they were placed on my trembling hands. And then another sound, one that was always like salt on a wound, burning it; it was the sound of his ominous boots, his harsh voice, and that face which bore evil as he entered the cell where I was. That brutal slap to my face that killed my pride and carved a wound in my soul that neither the years nor the doctors could heal. It was the beginning of pain and the end of dreams. Those insults against my family, wounding my honor, and the words with which he accused me of betrayal, claiming that we were helping the opposition and the imprisoned Mr. Mohamad Mamoun Alhomsi.

The defendant subjected me to the most brutal forms of psychological torture when he forced me to watch my brother, Khaled, inside the prison, tied with his hands above his head, blindfolded, and tortured. I was taken down a flight of stairs and into a corridor that I later

understood was Wing 13. I was doused in cold water and threatened that I would be treated like this every day. I was very afraid. To this day, whenever I look at my brother Khaled, even when he's laughing, that painful memory comes back to me and my heart aches with sorrow for him. I compare the way he looks now with how I saw him broken that day. I can still hear his wounded, resigned voice as he began to scream to the executioners: "Leave my brothers alone!! They have nothing to do with anything. Why?? What did they do?? Leave them, leave them!"

I realized sometime after my release that I was not arrested for any crime I had committed. Rather, my detention was arbitrary, used as leverage and revenge against my brother for his failure to carry out orders from the field commander, Samir Ousman Alsheikh.

I can never forget that period because everything in my daily life takes me back to that painful memory: sleep, water, food, the mention of my brother, my parents, the mention of oppression, cruelty and torture, travel, and even cars. Everything reminds me of those days. I can hardly forget them for a moment before I find myself back in them again.

One of the worst torments I suffered during that period was that time was distorted by fear and anticipation; every hour felt like a day, every day felt like a month, every month felt like a year! In those moments, I felt as if time had completely stopped when I entered that prison, which pressed down on my chest like mountains. I can hardly forget the details of that darkness, which emanated the stench of torture, oppression, and fear, nor do I forget the clanking of iron and the creaking of the doors; indeed, this period of nearly three months passed over me as if it were my entire life.

The tragedy transformed me from an ambitious, vibrant young man into someone with a constant fear of the unknown and who requires an exhausting psychological effort to overcome the trauma of "post-detention," which changed my psychological makeup forever.

The abuse of power and influence made the defendant, Samir Ousman Alsheikh, a person devoid of compassion, not governed by any conscience or moral compass, but rather one who does whatever his personal interests and the interests of his superiors dictate. Even if it means crushing and taking people's lives and oppressing them without the slightest regard for their humanity.

Your Honor, before I was detained, I was a young man passionate about sports, who took great care of my physical fitness and health. But the harsh consequences of what happened after my arrest destroyed this passion and created a suffocating social isolation for me, and chronic insomnia that steals my peace, in addition to the constant mental turmoil and constant anxiety about a lost future, all this toxic mental accumulation has made me neglect my physical and bodily health, and I no longer take care of it like I used to.

This physical exhaustion and neglect, forced upon me by depression, has left its clear mark on my body and facial features, which made me look older today than I am, and weighed

down by chronic fatigue and exhaustion, as if the years that the revolution stole from me have etched permanent sorrow and weariness onto my exterior.

This Honorable Court should be made aware of a prevailing and terrifying custom in my country: any political case or accusation attached to a family in Syria does not mean just the arrest of an individual. Rather, it means the total destruction of the entire family—socially, security-wise, and financially. They are placed on a blacklist to be targeted.

I see that the one who has caused sorrow and pain to me and my family since that period is the accused, Samir Alsheikh, where his oppressive actions had a ripple effect, leading to the complete disintegration of the family. Our path was changed forever. Three of my siblings chose to stay in Dubai, while that automatically prevented us from living safely in our country, which pushed us to think about fleeing and leaving Syria or staying far away.

Of all these effects, the most painful and sorrowful that aches my heart and remains there is how I lost my parents. That I was unable to be with them because of the continuing nightmare that started in Adra with Samir Alsheikh. One of the greatest sorrows that weighs on my chest is that the ones who raised us—risked their lives and sacrificed themselves and their health to raise and teach us to be better people—died without me having the honor of seeing them or saying goodbye. My mother died first, after suffering from an illness for eight years, without me being able to kiss her hands and say goodbye. Then my father died after a ten-year illness without me being able to see him or be by his side in his final moments. The last thing I heard from him was: “All praise is due to God that you emigrated from Syria.”

Your Honor: My parents’ constant fear turned our lives into a perpetual mourning, and it robbed us of the ability to celebrate any moment of joy, to the point that we could hardly ever see happiness.

Based on the foregoing, and with the utmost respect for the strictly legal aspect within the jurisdiction of this esteemed Court, I respectfully request the following: that the maximum penalty provided by law be imposed on the defendant, to serve as a deterrent to anyone who violates human dignity.

I thank you, Your Honor, for your generosity and for giving me this historic opportunity to let my voice be heard—a voice that the oppressors have silenced for twenty years. My gratitude to you comes from the depths of my heart, for in your justice and in this Court, I have found the embrace in which I wept after so many long years of weeping; tears that were not a sign of weakness, but rather a healing for my soul, which had endured the most bitter of hardships.

# EXHIBIT 5

**Anwar al-Bunni**
**Victim Impact Statement**

I am the Attorney Anwar al-Bunni. I am a Syrian and German citizen, a father, and a husband. I became a lawyer in 1986, and in 2004 I founded the Syrian human rights organization known as Syrian Centre for Legal Studies and Research (SCLSR).

Twenty years after I started using the law to defend the human rights of Syrians, I was arrested by security services in May 2006, along with other Syrian human rights defenders and politicians, after signing the Beirut-Damascus Declaration. I was sent to Adra Prison where Samir Alsheikh was head of the prison. He used torture, brutality, and humiliation to degrade us and deny us (along with the regular prisoners) our basic human rights.

I was familiar with Adra Prison because, as an attorney, I had visited my clients there. I knew the kind of torture that the prisoners were subjected to, especially in Wing 13, the Punishment Wing. I witnessed the torture that one of my clients, Dr. Aref Dalelah, had undergone, and I was forcefully ejected from the Supreme State Security Court after defending him and requesting that his torturers be held accountable.

On May 17, 2006, Syrian authorities arrested me because of my human rights work, including signing the Beirut-Damascus Declaration. I expected that this day would happen. Under the Assad regime, detention, torture, and enforced disappearances were fundamental tools of control and deterring opposition to the government.

At Adra Prison, I personally suffered and witnessed torture and inhumane conditions, which even the ordinary prisoners suffered from. Wing 13, the Punishment Wing, was well known in the prison, and prisoners would be sent there. Prisoners would return from Wing 13 and tell me about the torture they experienced, but I could also see the evidence of it on their bodies.

Obviously, Samir Alsheikh was the ultimate authority; nothing happened in the prison without his decision, his approval, or his knowledge. His decisions led to the torture and mistreatment of prisoners.

One time, after I sought legal help for a fellow prisoner who had been tortured, Alsheikh came directly to me. He accused me of encouraging prisoners to oppose him. I denied the claim and told him, “Nobody is above the law. We are here in accordance with the law and you need to act in accordance with the law. Do not misuse your power.”

Samir Alsheikh intentionally moved me to the same room in Wing 10 with Numeir al-Assad. Numeir was a cousin of Bashar al-Assad and the head of criminal gang that carried out killings outside the prison. This caused Bashar al-Assad to order his arrest and imprisonment.

So, Samir Alsheikh placed me in the same room in Wing 10 as Numeir al-Assad, and ordered him to kill me. Once, one of [Numeir's gang] picked me up and attempted to throw me from the second floor to the plaza on the underground level and I was beaten on the head, but survived.

Sometime later, I was transferred to Wing 8, where prisoners serving life sentences or awaiting execution were held. For the first three months, I could barely sleep because I believed I could be killed at any moment. Over time, I earned the protection of the other inmates by providing legal assistance, including helping them pursue appeals and retrials. They gave me a bit of protection, and this allowed me to sleep.

Still, my detention and mistreatment in prison devastated my family and affected every aspect of our lives—our finances, education, relationships, and future. I was the main breadwinner, and my wife and kids were left without financial stability. Because of me, the Assad regime also dismissed my wife from her job as an engineering assistant with the Syrian government's military housing department. This put social and financial pressure on us, and it took her months to find new employment in the private sector.

When I was imprisoned, my children were teenagers, and they had to halt their studies during my first hunger strike.

They faced difficulties in the local community, and there was an attempt to burn my car in front of my house, which blackened the house. My family and I always worried about the situation.

When I left prison after five years, in 2011, the revolution in Syria had started and the regime had increased its security restrictions, so I could not leave my house except on foot.

In March 2014, after authorities who were looking for me arrested and interrogated my brother, I fled Syria.

This case, and this trial is not about me. I am not here for personal revenge, rather this is about the thousands of victims who were not able to testify in court, receive justice, or have their voices heard in front of you. We now bring all their voices in front of you.

All Syrians applaud that justice was served for some Syrian victims. This fair trial set an example that has brought comfort to many Syrians.

Torture is an ordeal that greatly impacts a victim, along with his family. Samir Alsheikh did not carry out torture to extract information, but rather to break a person, and sometimes for his enjoyment. He monitored torture sessions in Wing 13 on monitors and enjoyed doing so.

This trial and sentencing are proof that torture is a crime that continues to this day. Its effect on victims is not only physical, but also mental. These victims and their families are affected for the rest of their lives.

Your Honor, this sentence will send a message to all victims of torture—today and forever—that torture is among the most egregious crimes humans can inflict on one another. There is no escape from punishment, and no safe haven for criminals, ever. Do not give up your right to serve justice. Thank you very much.

# EXHIBIT 6

**Dr. Kamal Allabwani**
**Victim Impact Statement**

Your Honor,

I thank this honorable court for the opportunity to speak about the impact that the persecution my family and I suffered at the hands of Samir Alsheikh's has had on us.

My name is Dr. Kamal Allabwani, I was detained for nearly ten years in Assad's prisons because of my activism advocating for democracy and human rights for all Syrians. I was mostly detained in Adra Prison, which was under the administration of Samir Alsheikh for several years.

After completing my medical training, I opened a clinic and hoped to serve my community by providing the best medical care. However, I became involved in political activism due to the injustice, corruption, and repression perpetrated by the regime, and I joined with other prominent dissidents to call for reform. This call was met with brutality. When I returned from a trip to the U.S. where I conveyed Syrians' aspirations for freedom and democracy, I was arrested in November 2005 and taken to Adra Prison. Samir Alsheikh was then the head of the prison.

During Alsheikh's tenure as Head of the prison, he did not follow prison regulations. For years, I was subject to degrading treatment and persecution, and many prisoners were recruited to attack me; I was repeatedly punished in solitary confinement in Wing 13. Alsheikh ordered my transfer to those underground cells, which were filthy, infested by rats, and surrounded by sewage water. Guards forcibly shaved my head, and my body was covered with lice and scabies, causing me a painful skin condition. I was denied basic medical treatment, and on several occasions, I was subject to attempts to harm me by prisoners who Samir Alsheikh personally incited, including Nimer al-Assad (Maher al-Assad's cousin), and Muhammad al-Said. Others, like Muhammad Aweishat and Maqdad Salloukha, refused to carry out these orders and instead informed me of the threats to my life.

Honorable prisoners who tried to encourage me or protect me, were sent to Wing 13 and tortured. Nidal Shikhani, who now leads a respected human rights documentation organization, was dragged in front of me by Ziyad Bakro, and beaten for attempting to send me a letter of support. Another prisoner, Maqdad Salloukha, told me that Samir Alsheikh had wanted to kill me and gave him a knife to do so. He refused. When I saw him months later in the prison, he said he had been sent to Wing 13 for three months because he refused the order.

I was held in a civilian prison so the regime could claim I was a criminal prisoner, but I was subjected to constant harassment by most of the prisoners around me, acting on direct

orders from Samir Alsheikh, who flouted the law, his duties, and his oath to seek personal gain.

General Samir constantly sought to break the political prisoners and force them to surrender by identifying their physical and mental vulnerabilities and ruthlessly exploiting them. A fellow prisoner once told me that you cannot let those in charge think that you want to be released. Showing that fear would only give them a way to hurt you.

Samir Alsheikh intervened in my case, and through pressure and intimidation, orchestrated witness statements from within the prison to fabricate a case to be heard by the military court. This resulted in three years being added to my sentence on the charge of spreading false news, an offense that requires public dissemination. How could we possibly spread news from a closed prison?

While in Adra, security services came to my house at night to threaten my wife and children. I have two daughters and a son. They prevented us from renting out the house and fired my wife from her job. They cut off our income. They targeted my family to torment me. My family still suffers. My daughter says that fear still haunts us until today. All of us are suffering, still, because of Samir Alsheikh. My children grew up without a father because I was detained for nearly ten years of their lives. I now have three grandchildren and they provide me with hope for the future.

To endure the conditions of prison, I became emotionless and fearless because this was the only way I knew how to cope with the intimidation and threats in order to survive. This was a curse. When I was finally released in 2011, I emerged a robot. I don't like being this way. I became a fighter, not a human being.

In prison, I didn't let Samir Alsheikh or his subordinates see my suffering. Not once, in all those years. But today I say it: I am suffering, my family is suffering, and we are not alone. Twenty years later, his many victims are all still suffering.

**Conclusion**

Your honor, I ask that you impose the maximum sentence permitted under the law. We need this message now just as urgently as we needed it then: the torture of one individual is the torture of an entire family, and it keeps all of us in a state of oppression. I testify today from Sweden, but I am still haunted by what happened to me close to two decades ago. That is the harm Samir Alsheikh caused.

The fall of the regime, of which Samir was a pillar and an instrument, does not mean that the risks of torture and persecution have disappeared. We urgently need deterrent legal measures against any authority that would even consider such actions. Impunity remains

the norm in our countries. We hope you will convey these lessons and insights to our officials so that we may finally build a judicial system worthy of humanity.

Finally, I would like to remind Samir that when they were torturing me in solitary confinement, I mean Samer Barakat, Ziad Bakro and others, I told them, one day, you will be tried. He used to mock me and the United States of America, and sneer. Fate answered my prayer and allowed me to live to see him behind bars in the very same United States that he thought would welcome him after all his crimes. Thank you to the U.S. judiciary, which gives us hope for justice.

# EXHIBIT 7

**Mahmoud Issa**
**Victim Impact Statement**

Bashar al-Assad's defunct dictatorial regime, which he inherited from his father, the dictator Hafez al-Assad, transformed Syrian society into one of the 'societies of fear' from the early 1980s onwards. Repressive policies stripped public life of its political dimension and shattered the organized cultural and civic frameworks. I was one of hundreds, indeed thousands, of pro-democracy activists who stood up to tyranny and endured the harshest conditions and acts of brutality in that struggle.

I was arrested—along with a group of detainees, including activists Michel Kilo and Anwar al-Bunni—for signing the "Beirut-Damascus Declaration;" we were arrested because we called for the establishment of genuine fraternal relations between Syria and Lebanon. Three hundred people signed this Declaration, many of whom were human rights activists and civil society members. The charges against me were baseless—nothing more than the expression of an opinion—and I was forced to endure arbitrary and inhumane conditions of detention in Adra Prison, without being granted my right to a fair trial.

I was imprisoned four times. First in Adra Prison, then in the dreadful Palmyra Prison. Nevertheless, these periods in prison failed to extinguish my yearning for freedom, nor could it extinguish my dream of social justice, democracy, the establishment of the rule of law, and an end to corruption and nepotism. After my release in 2000, I returned to political activism.

I was later arrested and detained at Adra twice in 2006, from May 2006 to September 2006 and from October 2006 to June 2009.The May arrest came to the shock of my children, Najm and Bahar. State security services handcuffed me behind my back, in front of my son Najm, aged four, who stood motionless by the door. I called out to him to come to me, but they came between us. Bahar was not yet two years old.

They tore my children away from me and I was powerless before them. Although I haven't seen my family since 2013, and my children grew up far from me, experiencing all the seasons and shades of terror. Together we endured the consequences of forced separation, which imposed its presence on my children, my family, and our relationship—a relationship that lacked a father's presence when it was most needed. That gap is difficult to fully bridge today.

During my third and fourth imprisonment, I realized the scale and extent of oppression, which I had not known during the eight years I spent in my first period of imprisonment in Adra and Palmyra, before I was married and had children. After the 2007 prison uprising, I was ordered to Wing 13. I had previously seen prisoners dragged there, beaten with cables and batons. I knew I would be severely punished. There, I saw car tires, batons, and other torture devices. I heard the unmistakable screams of prisoners being tortured. I feared for my life.

My time at Adra, while Brigadier General Alsheikh was the head of the prison, taught me that prison in Syria was designed so that those who enter do not leave as they entered. It is designed so that inmates carry its scars for the rest of their lives and are driven away from political activism and concern for public affairs. This time in Adra I learned that, when they imprison you, those in charge spend every moment making your life hell. During my time at Adra, under Alsheikh's leadership, I heard the screams of those being tortured. I witnessed them being beaten with batons and electric cables and others being dragged through the prison to Wing 13 during the 2007 riots.

Despite this, freedom remained my guiding principle after my fourth imprisonment. My conviction remained unwavering that we must make sacrifices to secure freedom for our children and grandchildren.

All the suffering, the years of imprisonment and deprivation become bearable for the sake of this noble cause for my people and for Syria. Millions of displaced and forcibly exiled people have returned to their homes, their cities, and their villages in Syria. I personally felt joy and happiness when I realized that all the oppression and imprisonment had not been in vain, but had borne fruit. I am also filled with joy today when I see so many people and humanitarian and human rights organizations across the oceans and seas honoring me and recognizing my sacrifices alongside my people.

The trial of Brigadier General Samir Alsheikh in Los Angeles marks an important milestone and holds profound lessons regarding justice for Syrians and for me. Here stands the General, standing in the courtroom before his victims, confronted by the testimonies of witnesses who were victims of Brigadier General Samir Alsheikh while he served as the head of Damascus Central Prison (Adra Prison), where I was an inmate on numerous occasions.

Today, the roles are reversed: the victims are witnesses in the courtroom, whilst Brigadier General Samir, the dictator's staunch supporter, sits in the courtroom, listening from the mouths of his victims to the accounts of the torments for which he was directly responsible.

I was present in the courtroom while the verdict was read, with the accused Brigadier General sitting before me, along with all the key figures in the trial: the judge, the prosecution, the defense, and the lawyers. Brigadier General Samir was glaring at me, as were some members of his family who were present. I would have liked to stand in the courtroom and address everyone, especially Brigadier Samir, after he had been found guilty by the jury of the charges against him, and say to him: "You have brought this upon yourself, Barqash![1] This is the result of what your own hands have wrought, Oh General!

These trials and verdicts are essential to hold the perpetrators to account. There is no justice without accountability, and it carries powerful lessons: so that the tragedies suffered by the

[1] Referring to a proverbial army dog whose barking betrays the location of the unit.

Syrian people are not repeated, and so that we may build a new Syria free from oppression and tyranny.

I know full well that we have not yet fully realized our dream, but we are halfway there. And I know that we are working for the sake of our children and grandchildren in the Syria we desire. For the sake of our grandchildren and yours, Brigadier General, so that we may put an end to political oppression and any authority that oppresses Syrians. Freedom will remain my goal now, just as it has been throughout my life. So that these tragedies are not repeated, and so that past and present perpetrators are held to account.

Despite all of what I and other victims in Adra experienced, I do not want revenge, because revenge undermines justice. There is no justice without a trial, and no tyrant should escape justice. I want Brigadier General Samir to receive the punishment he deserves in accordance with law and the magnitude of the tragedies and suffering he caused the victims. So that his sentence may serve as a lesson for Syrians—both rulers and the ruled—for the sake of healing, reconciliation and the restoration of the victims' dignity.

Mahmoud Issa

# EXHIBIT 8

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



### DETAILS OF INVESTIGATION

On September 19, 2024, at approximately 0800 hours, Homeland Security Investigations (HSI) Special Agent (SA) Daisy Garza, Human Rights and Special Prosecutions (HRSP) Attorney Patrick Jasperse, HRSP Attorney Alexandra Skinnion, and HRSP Historian Philip Hoffman conducted a video interview with [redacted], date of birth [redacted] Also present via video conference was the legal counsel representing [redacted] Duncan Pickard, Winston Paes and Taylor Booth, attorneys with Debevoise & Plimpton LLP law firm. Philip Hoffman provided interpretation from Arabic to English.

The following is a summary and not a verbatim account of the interview with [redacted] (Agent's note: [redacted] is currently residing in [redacted] and had agreed to be interviewed via Debevoise & Plimpton LLP).

[redacted] first interacted with Samir ALSHEIKH sometime on or around September of 2001, which was a week before [redacted] was detained. [redacted] was contacted by ALSHEIKH via telephone at his medical clinic. During that call, ALSHEIKH asked [redacted] to meet with him in person. However, [redacted] refused to meet with ALSHEIKH because at that time ALSHEIKH worked in the political security branch. After [redacted] refused to meet with ALSHEIKH, ALSHEIKH sent an officer named Burhan ISBA to ask [redacted] to meet with ALSHEIKH in person. Again, [redacted] refused to meet with ALSHEIKH.

[redacted] stated he was imprisoned at Adra Prison (Adra) on two separate occasions. Both times he was imprisoned for "undermining the prestige of the state." The first time he was detained for four years and five months, approximately from 2001 to February 2006. The second time he was detained for two and a half years, approximately from June 2007 to February 2010.

[redacted] met ALSHEIKH during his first detention period at Adra. At that time, ALSHEIKH was the head of the political security branch in Damascus. [redacted] stated that during his in-person meeting with ALSHEIKH, ALSHEIKH told [redacted] he needed to remember he was a doctor who had a good financial situation and should not be opposing the president. ALSHEIKH told [redacted] if he wanted to leave Adra he needed to apologize to the president. [redacted] recalled telling ALSHEIKH that he was unlawfully detained and refused to apologize. [redacted] recalled the meeting lasting about fifteen minutes. After [redacted] met with ALSHEIKH, ALSHEIKH told [redacted] he was disgracing himself and that he would regret his decision. [redacted] stated that after that meeting, ALSHEIKH had another guard, Samer BAROUDI, who was the head of the political division, take him away. [redacted] stated that after his one-to-one meeting with ALSHEIKH, he did not have any other individual interactions with him.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Samir ALSHEIKH, HRV/WCU | [redacted] | 10/22/2024 |



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



[redacted] stated that after he and ALSHEIKH met, ALSHEIKH also pressured [redacted] wife, [redacted] ([redacted]). According to [redacted] ALSHEIKH put pressure on [redacted] so she could put pressure on [redacted] According to [redacted] ALSHEIKH told [redacted] that people that go to prison never come out, and that they ([redacted] and [redacted] had the opportunity to change that. Additionally, he reminded [redacted] of their financial and familial obligations.

[redacted] stated that ALSHEIKH became the head of Adra sometime on or around 2005 until 2008. Durning [redacted] second detention, when ALSHEIKH was already in charge of Adra, ALSHEIKH had a meeting with all the political prisoners. ALSHEIKH gathered the political prisoners in front of his office. [redacted] recalled ALSHEIKH wearing a uniform, he could not recall the color, but stated it was a uniform that a brigadier would wear with the three stars and an eagle. [redacted] recalled the meeting being more of a scolding because the political prisoners were wearing civilian clothes, and ALSHEIKH wanted them to wear uniforms like the criminal prisoners. [redacted] stated that ALSHEIKH believed everyone was at Adra for a crime, so all the prisoners needed to wear uniforms. Because the political prisoners refused to wear the uniforms, ALSHEIKH decided that the political prisoners would not get to bathe, shave, go to the courtyard or receive hygiene products.

[redacted] stated that during his first detention at Adra he was in the political detainee wing, wing 2. The conditions at that time were four people to a room, they had visitation rights, and other people were allowed into their rooms. He recalls there being recording devices in the room so prison officials could listen to their conversations. During his second detention, the political prisoners were not in a separate wing, instead they were distributed among other wings. [redacted] was in wing 5 with individuals that had committed robberies.

[redacted] stated that it was obvious that ALSHEIKH was the head of the prison. He stated that there was a black market in each part of the prison, and ALSHEIKH had someone that would represent him. According to [redacted] there was a lot of commerce in the prison and ALSHEIKH was running it. [redacted] stated the food provided at the prison was insufficient so you had to have money to buy food. The young prisoners worked as servants because they did not have enough money to buy food. ALSHEIKH was the head of the black market. [redacted] stated ALSHEIKH had another prisoner, Habib SINJAB, assist him with this black market.

[redacted] recalled that while he was never physically mistreated at Adra, he was interrogated and experienced mental abuse. While at Adra, during his separate detentions, [redacted] never saw other prisoners get tortured but would see the effects of those that were. [redacted] recalled during his first detention he spent some time in the isolation cells and could hear people get beaten. During his second detention, he recalled seeing prisoners with swollen legs and unable to walk.



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

## REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



[redacted] stated that the punishment wing, wing 13, was underground. While he never went to wing 13, he recalled seeing people that would come out of wing 13. He was told prisoners were put in tiny cells that filled with water, people would be covered in lice, and it would take weeks to treat them. [redacted] was told about individuals that were put in car tires and would get beaten or put into a contraption known as "the German chair" (Agent's note: "the German chair" refers to a mechanism used in Syria to torture detainees in which the detainee is bent backwards to the point their back feels like it will break).

[redacted] stated that during his second detention one of ALSHEIKH's informants, which was another prisoner, wrote a report about [redacted] stating he had insulted the president. Because of that, [redacted] was sent to military court. [redacted] stated that the transportation to the military court was torture. They put twenty people in a car, chained up in extreme weather, which he described as being very hot. [redacted] stated that the informant also served as the witness in court, and while [redacted] was not convicted of any additional charges, it was a way for ALSHEIKH to humiliate him.

[redacted] stated he remembers surveillance cameras in the courtyard at Adra. He stated that Adra was divided into different wings, each crime had its own wing. For example, people who committed economic crimes would have their own wing. Each wing had twelve rooms and the number of people in each room depended on how crowded the prison was.

[redacted] stated after his second detention he was able to get a [redacted] visa which allowed him and his family to flee to [redacted] they left Syria in 2011. He currently lives in [redacted] and continues to work as a medical doctor. He is a current citizen of [redacted] and has a visa to the United States.

[redacted] stated that he was willing to testify for the U.S. government with advance notice due to his medical practice. The interview concluded at 930 hours and [redacted] was thanked for his time.

The Investigation Continues.



This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# EXHIBIT 9

# Massacre in Syria: Regime seeks to end protests before Ramadan. By Ray Moseley

AlArabiya.net

July 30, 2011 Saturday

Copyright 2011 AlArabiya.net. Provided by Syndigate.info, an Albawaba.com company All Rights Reserved

**Length:** 583 words

## Body

The massacres unleashed by Syrian President Bashar Al Assad's regime this weekend represent an all-out military attempt to quell widespread protests before the beginning of Ramadan on Monday, according to a leading Syrian dissident in London.

During Ramadan, Muslims fast during the day and go to their mosques at night to pray. The fear among regime officials, said Ausama Monajed, is that huge numbers will come out of the mosques at night to mount even larger protests against President Assad's authoritarian regime than has been the case previously. "At night people feel safer. It is easier to disperse and hide," he said.

Mr. Monajed, a former United Nations and former European Union official, said the regime had recently been trying to discourage people from going to mosques during Ramadan, telling them that, because of a heat wave, they should pray at home.

"People have lost their fear. They don't feel the regime's authority any more," he said.

The mass killings in Hama and other cities, he said, will be followed by "huge funerals" on Monday, which will lead to more protesters taking to the streets.

"What do they expect will happen then?" he said. "It is utterly insane. They don't learn that brutal force doesn't work."

Mr. Monajed said he was in direct touch with a number of protesters inside Syria, who told him that more than 100 had been killed in Hama alone and 60 corpses were delivered to the city's Horani hospital.

"A tank is perched in front of it, shooting at anything that moves," he said.

But he said his sources told him that 10 tank crews defected and engaged regime armoured units, forcing them to retreat to the gates of the city.

Hama has been one of the focal points of the protests against the Assad regime that have continued for several months.

In February 1982, the Sunni population of Hama revolted against the Alawite-dominated regime of President Hafez al-Assad, father of Bashar, and the revolt was only put down after tens of thousands were killed, most of them civilians. The death toll has variously been estimated at 10,000 to 40,000.

Mr. Monajed said he had received reports that, since Saturday, more than 15 protesters had been killed and more than 60 injured in the town of Deir ez-Zour. Five areas of the town are completely cut off, he said, with snipers on roofs shooting at anything that moves.

He said army units defected on Saturday at al-Dura square in the town, and regime planes took off from Damascus to destroy their armored units. But he said this did not happen because the defectors left their equipment behind.

However, he said, regime forces shot and apparently killed the new mayor and military intelligence chief there.

Deraa and Homs also were attacked, but not as severely as Hama, he said. "They are ghost towns at the moment."

Mr. Monajed said the regime's simultaneous attacks on various cities will lead to wider demonstrations all over Syria, "as people are usually moved by the stories of their friends and relatives, not by strangers."

The BBC reported that the US Embassy in Damascus had declared that "a full-on warfare" had been undertaken by the regime against its own people. Hospitals were reported to be running out of medicines and protesters have attacked and set fire to several police stations in Hama, according to the BBC.

(Ray Moseley is a London-based former chief European correspondent of the Chicago Tribune and has worked extensively in the Middle East. He can be reached at *rnmoseley@aol.com*)

## Classification

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Journal Code:** 174

**Subject:** RELIGION (91%); 2011 SYRIAN UPRISING (90%); NEGATIVE MISC NEWS (90%); PROTESTS & DEMONSTRATIONS (90%); RAMADAN (90%); MUSLIMS & ISLAM (89%); WAR & CONFLICT (89%); NEGATIVE NEWS (87%); ARMIES (78%); MIDDLE EAST PROTESTS & UPRISINGS (78%); POLITICAL PROTESTS (78%); TYPES OF GOVERNMENT (78%); GENOCIDE (77%); CITY GOVERNMENT (76%); DEATH & DYING (73%); EUROPEAN UNION (73%); SHOOTINGS (72%); WEATHER (68%); MAYORS (60%); UNITED NATIONS (54%)

**Industry:** ARMIES (78%)

**Person:** BASHAR AL-ASSAD (79%)

**Geographic:** DAMASCUS, SYRIA (79%); HOMS, SYRIA (79%); LONDON, ENGLAND (73%); SYRIA (94%); EUROPEAN UNION MEMBER STATES (56%)

**Load-Date:** July 31, 2011

---

**End of Document**

# EXHIBIT 10

# Syrian tanks "resume shelling" eastern town

BBC Monitoring Middle East - Political

Supplied by BBC Worldwide Monitoring

August 25, 2011 Thursday

Copyright 2011 British Broadcasting Corporation All Rights Reserved

**Length:** 732 words

## Body

Text of report in English by Qatari government-funded aljazeera.net website on 25 August; subheadings as published

["Syrian tanks 'resume shelling' eastern town"]

Syrian government tanks have resumed shelling in the town of Dayr al-Zawr a day after at least 17 protesters were reportedly killed across the country, activists said.Syrian security forces stormed the area of al-Busaira in Deir ez-Zour on Thursday [25 August] amid heavy gunfire, conducting house-to-house searches, said the Local Coordinating Committees of Syria (LCC), a group of activists representing provinces across the country.

Despite the crackdown, anti-government protests are ongoing across the country.

Tanks and armoured vehicles have entered Shuhail, a town southeast of the provincial capital of Dayr al-Zawr, which has seen daily protests against President Bashar al-Asad's rule since the start of the Muslim fasting month of Ramadan, a local activist said. "Initial reports by residents describe tens of tanks firing randomly as they stormed the town at dawn. Shuhail has been very active in protests and the regime is using overwhelming force to frighten the people," activists said.

In another incident, the LCC said masked Syrian security force members and masked pro-regime shabiha militiamen attacked Ali Ferzat, Syria's best-known satirical cartoonist, at the capital's Ummayad square while he was returning to his home. "The attackers stole the contents of his briefcase, including his drawings and other personal belongings," the LCC's Omar Idlbi said in a statement.

"He was beaten hard, notably on his hands. Passers-by found him on the road to the airport and he was taken to hospital," he said.

Meanwhile in the central province of Homs on Thursday, Syria's state news agency reported the deaths of eight Syrian soldiers, including an army officer, in what it said were separate attacks a day earlier.

"In an ambush Wednesday afternoon at (the town of) Talbisa, terrorists fired on a military bus killing one officer and two soldiers and wounding seven others," said one military official quoted by the agency.At al-Rastan further north, "a terrorist group fired on a military vehicle killing five soldiers," the official told SANA.

Tightening sanctions

Amid the increasing violence, the European Union and the United Nations announced plans for more sanctions against al-Asad's regime.

EU governments are likely to adopt an embargo against imports of Syrian oil by the end of next week, an EU diplomat said on Wednesday.

Valerie Pecresse, a French government spokeswoman, said: "France pressed for tougher sanctions on Syria and more pressure from the United Nations to bring about a democratic transition there."

A European and US draft resolution on Tuesday called for UN sanctions against the Syrian president, 22 Syrian officials and the country's General Intelligence Directorate, reported the Reuters news agency.

The EU's 27 governments agreed last Friday to explore new sanctions against Asad in response to his five-month crackdown on pro-democracy demonstrators, in which the UN said 2,200 civilians have been killed.

The UN's human rights council launched an investigation on Tuesday into the violence, including possible crimes against humanity, despite objections from Russia, China and Cuba.

The EU has already placed sanctions on dozens of Syrian officials and state entities, but has taken incremental steps in broadening its measures. Some states are concerned about putting commercial interests in Syria at risk.

"Ahmadinezhad calls for dialogue"

Meanwhile, Iranian President Mahmud Ahmadinezhad called for dialogue between the Syrian government and opposition to end the months of violence."The people and government of Syria must come together to reach an understanding," he told Lebanese Al-Manar television, the station run by Lebanon's Hezbollah movement.

"When there is a problem between the people and their leaders, they must sit down together to reach a solution, away from violence," he said.Separately, the Arab League announced it would hold an emergency meeting on Saturday to discuss the situation in Syria.

"It is unlikely that there will be decision on a no-fly zone or military intervention in Syria similar to what took place in Libya," said a permanent representative of an Arab state at the league who refused to give his name.

Source: Aljazeera.net website, Doha, in English 25 Aug 11

## Classification

**Language:** ENGLISH

**Publication-Type:** Transcript

**Subject:** WAR & CONFLICT (93%); PROTESTS & DEMONSTRATIONS (91%); NEGATIVE MISC NEWS (90%); EUROPEAN UNION (89%); NEGATIVE NEWS (89%); TERRORISM (89%); TERRORISM & COUNTERTERRORISM (89%); TRENDS & EVENTS (89%); EMBARGOES & SANCTIONS (86%); ARMED FORCES (85%); INTERNATIONAL RELATIONS (85%); UNITED NATIONS (84%); UNITED NATIONS INSTITUTIONS (83%); CARTOONS & COMICS (78%); GOVERNMENT & PUBLIC ADMINISTRATION (78%); MIDDLE EAST PROTESTS & UPRISINGS (78%); NEGATIVE POLITICAL NEWS (78%); POLITICAL PROTESTS (78%); ARMIES (77%); COMMUNITY ACTIVISM (77%); DEATH & DYING (77%); PARAMILITARY & MILITIA (77%); MUSLIMS & ISLAM (73%); TERRORIST ORGANIZATIONS (73%); RAMADAN (68%); VISUAL ARTISTS (65%); INTERNATIONAL ECONOMIC ORGANIZATIONS (60%)

**Industry:** ARMED FORCES (85%); PUBLIC BROADCASTING (79%); CARTOONS & COMICS (78%); ARMIES (77%); PRESS AGENCY RELEASES (73%); VISUAL ARTISTS (65%)

**Geographic:** SYRIA (99%); EUROPE (92%); MIDDLE EAST (92%); FRANCE (90%); EUROPEAN UNION MEMBER STATES (79%); QATAR (79%)

**Load-Date:** August 25, 2011

---

End of Document

# EXHIBIT 11

SYR.D0100.008.015_ET
[Translator's Note: Translator's commentary is in brackets, and handwritten text is written in italics.]

*Office*
FROM: FAX NO.: 29 May 2008 10:21AM P1

Syrian Arab Republic
Ministry of Interior
Political Security Department
Political Security Branch of Deir al-Zor
Section: Abu Kamal
Number /577/8 Political
Date /11/9/2011

Head of the Political Security Branch of Deir al-Zor

| Serial Number | Information | Source | Validity | Reference |
|---|---|---|---|---|
| | At 5:00 on /11/9/2011/, a force reinforced by all the security agencies of the district, and with backup from the army, tracked and searched for the wanted persons and armed individuals in the district and raided the places where they might be found, based on available information. The security forces managed to arrest a large number of [wanted persons] and of armed individuals who participated in attacking government buildings and security detachments in the district. A few light weapons and some cameras that were being used by the demonstrators were confiscated from the raided locations. There were no incidents to report during the implementation of the operation to track wanted persons, except for the fact that members of a patrol from the Abu Kamal Military Intelligence Detachment shot to disperse civilians who were in the way of the patrols. The shooting resulted in a woman from the village of Al-Huri, who was in the Abu Kamal city market, getting struck by a stray bullet which pierced her back and exited through her chest, killing her. Her body was released to her family, without any reaction by her family about the incident. A girl of about ten was wounded in her thigh by the same bullet. The same bullet also wounded one Tahsin Abdul Razzaq al-Jumaa, a resident of the city of Abu Kamal, in the foot. His injury was minor.<br>In other news, the head of the Military Intelligence Department, Major General Abdul Fattah Qudsiyeh and the governor of Deir al-Zor, Mr. Samir al-Sheikh came to the district and supervised the activity of the patrols. They met with the district officers and praised their excellent work throughout this day. They urged them to work harder and do their utmost to conclude this operation and arrest all the wanted persons and armed individuals within 48 hours. Major General Abdul Fattah Qudsiyeh […] | Our section's members | Confirmed | |

# EXHIBIT 12

This copy is for your personal,noncommercial use only. You can order presentation-ready copies for distribution to your colleagues,clients,or customers. Visit www.csmonitorreprints.com for samples and additional information. Order a reprint of this article now.

**MIDDLE EAST**

# A day in the life of a UN observer in Syria

Gen. Robert Mood's job is to convince both sides in Syria's civil war that they're not interested in destroying the other.



Khaled al-Hariri/Reuters

Norwegian Major-General Robert Mood, chief of the United Nations Supervision Mission in Syria, shakes hands with Syria's Deputy Foreign Minister Faisal al-Miqdad after their meeting in Damascus last week.

**By Gert Van Langendonck**, Correspondent

June 13, 2012, 8:15 a.m. ET

**DEIR EZ-ZOUR AND MUHASSAN, SYRIA**

As soon as Gen. Robert Mood stepped out of his white SUV he was mobbed by hundreds of men, women, and children.

The leader of the unarmed UN observer mission to Syria had come to the village of Muhassan, and the Sunni population was ready for him. They carried pictures of the "martyrs" killed here since the Syrian uprising began.

The children shouted, "Bashar is a donkey," and everyone crowded around the Norwegian general before he got down to business: A meeting with senior commanders of the Free Syrian Army, the loosely structured rebel army fighting to oust President Bashar al-Assad's Baath regime.

Muhassan is an FSA stronghold, but it is only a short drive from the provincial capital of Deir Ez-Zour near the Iraqi border, which remains in government hands. Between the two is the landscape of a Syrian civil war that has only deepened since Mood's mission began in April.

Rebels from the country's Sunni majority lust for revenge after massacres blamed on the government. Assad supporters, most from his minority Alawite sect, dismiss the rebels as foreign terrorists and call for tougher government reprisals. For many, the conflict has become an existential one: win, or risk being wiped out.

Gen. Mood's job is to convince both sides they're not interested in destroying the other. That proposition grows tougher by the moment. A conversation with the governor of Deir Ez-Zour, Samir el-Sheikh, illustrates how far apart both sides are. He was pleasant enough during the meeting earlier that day, but his tone was anything but conciliatory.

"The government has been far too patient with these people ... the armed groups simply have to give up their weapons," says Gov. Sheikh, an Alawite who was appointed governor after the uprising began. "But they don’t want this situation to end because

they are criminals and they are getting rich off this situation. The real opposition is in the parliament in Damascus."

The governor apologizes for being slightly hard of hearing – a result, he says, "of all the shooting I did in the 1980s." The early 80's witnessed the last big uprising against the Baath regime, led at the time by the Muslim Brotherhood. Back then Bashar al-Assad's father, Hafez, was president, and the uprising ended in 1982 after the Syrian Army sacked the city of Hama, with at least 10,000 residents killed.

To be sure, the younger Assad's regime has not carried out a massacre on that scale since protests broke out in March 2011. But the US and rebel activists say there is mounting evidence of systemic killing of civilians, as well as rebel fighters, and many expect the violence to worsen. The UN alleges children have been targeted for torture and execution by pro-government militias in the past year.

Yesterday, rebel activists alleged Syrian government forces shelled a neighborhood of Deir Ez-Zour, killing 10, after anti-Assad protests broke out. In recent weeks, there have been reports of major massacres by pro-government militias and evidence that heavy mortars have been used to shell densely-packed cities. The State Department alleges that fresh massacres are being planned by the government and the UN finally admitted today what had long been apparent – that the country is in the midst of a civil war.

## Sunni teen: 'I can't go anywhere'

But despite the challenges, Mood appears undaunted.

"If the choice is between hopeful and pessimistic I would land on hopeful," says Mood, in charge of a 271-member observer mission, after his meetings. "What we've seen in Deir Ez-Zour is that people want to get back to work, they want food on the table, they

want their children in school, they're concerned about their crops. On the other hand the governor is eager to find a solution for his [province] and he is 100 percent committed to the six-point plan."

Afterwards, Mood told Syrian TV that the meeting had been constructive. "The governor has promised to release all the [rebel] prisoners if the other side puts down its weapons," he said.

But the likelihood of the opposition surrendering at this point is slim and none, and the cease-fire that was supposed to take effect in April has been shot full of holes right from the start. And after months of bloodshed it is hard to imagine how the Syrian opposition could agree to any deal that doesn't include the departure of President Assad and his regime. It is just as unimaginable that Assad would agree to share power with what his regime has consistently referred to as "terrorists."

In this region, that has left many Syrians caught in the middle, and the danger doesn't just come from the regime. "Anyone working for the government is a target," says an 18-year-old Sunni in Deir Ez-Zour who requested anonymity. "My dad works for the government, and I can't go anywhere in Deir Ez-Zour for fear of being killed or kidnapped."

Not long ago, he and friends survived a kidnapping attempt. "We never knew who they were, but they seemed to have coastal accents," he says, suggesting that they were Alawites. "I am stuck between a rock and a hard place. The opposition is after me because of my dad, but 13 friends from my tribe have been killed by the Army. The situation is quite hopeless."

Of course, Mood is not in Syria to impose peace. Kofi Annan's six-point plan merely asks everybody to be nice while the Security Council members figure a way out of the current stalemate, with Russia so far vetoing a tougher stance against the Assad government.

"We don't have the luxury of years; we have at best months," says Mood. "The spiral of violence can only lead to an outcome that nobody wants, a nightmare scenario that would have huge consequences for Syria and the region."

The Syrian opposition is increasingly skeptical about the UN observers mission. Activists have started posting pictures of UN observers smoking water-pipes at sidewalk cafes while atrocities go unmonitored nearby.

## Resources?

That's probably a bit unfair, given the limited mandate and resources of the UN mission, but it does strike the visitor that the parking lot at the Damascus hotel where many of the observers stay seems to be full of UN vehicles at any time of the day.

Expectations that the UN observers could help lift the fog of war have also fallen short. Observers haven't been able to establish who is responsible for the big massacres such Although the observers have established that a massacre did occur at Houla, and last week at Al-Qubeir, it has not assigned blame.

The same goes for a massacre in Deir Ez-Zour at the end of May, when the bodies of 13 men were found, shot in the head with their hands tied behind their backs. "It is impossible for us to go beyond establishing the facts," Mood says, "but this is tremendous in itself."

The people of Muhassan are not convinced. During Mood's visit, complaints are everywhere. "As soon as you leave here we will be attacked, and what happened in Houla will happen here," says a man who identifies himself only as Abu Leith.

Muhassan is surrounded by the Syrian Army, which has established forward bases in a school and a water tower. Abu Leith says most men here have not left the area for months, "because they have wanted lists at the checkpoints and most of the men here are on the list."

The graffiti at the Army checkpoints betrays the mentality of the soldiers. “Assad, or we burn down the country.” In the event, Muhassan was not attacked that night, and all of Deir Ez-Zour had a quiet night during Mood’s overnight stay. But three days later Abu Leith called with the information that the soldiers in the water tower have fired on a mini-bus taking girls to school, killing one girl. The FSA attacked the checkpoint, and the Army responded with shelling, he said.

## Could be worse

Still, the UN observer mission is an improvement over an earlier mission of Arab League observers. Activists in Damascus still laugh when they recall how the observers were tricked into going to the wrong neighborhoods because the regime had switched street signs on them.

But in Deir Ez-Zour it was no laughing matter. On a rooftop in a poor area of Deir Ez-Zour, an activist who calls himself Alaa El-Deiri recalls how people gathered in the town’s Midilgi Square last January after word got out that the Arab League observers were coming to town. “The observers never came. After the Army was through 20 protesters had been killed,” says Mr. Deiri.

Last year, Midilgi Square had been Deir Ez-Zour’s own "Tahrir Square." But unlike in Cairo, there was no foreign media to bear witness. For 51 days, pro-democracy protesters held out. Then the army moved in. In the following week, 117 protesters were killed, says El-Deiri. “We are the forgotten city.”

One concrete effect of the UN presence is that the flatscreen TV in the hotel where the observers stay in Deir Ez-Zour is showing Deir Ez-Zour TV, an opposition satellite channel that runs continuous footage of atrocities blamed on the government.

That may seem odd, given that the TV is right next to Assad’s official portrait. But a UN monitor from Morocco is holding the remote.

---

Read this article in https://www.csmonitor.com/World/Middle-East/2012/0613/A-day-in-the-life-of-a-UN-observer-in-Syria

Start your subscription today https://www.csmonitor.com/subscribe

© 1980–2026 The Christian Science Monitor. All Rights Reserved. Terms under which this service is provided to you. Privacy Policy. Do Not Sell My Personal Information.

# EXHIBIT 13

**DECLARATION OF CHARLES PARK**

I, Charles Park, declare:

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP"), as a Health Services Administrator at the Metropolitan Detention Center in Los Angeles, California ("MDC Los Angeles"). I am also a United States Public Health Service Commissioned Corps Officer. I have been employed by the BOP since June 2014 and stationed at MDC Los Angeles since August 2022. Since my employment with the BOP, I have served as the Staff Pharmacist at the Federal Correctional Complex in Victorville, California ("FCC Victorville"), Assistant Health Services Administrator at Federal Correctional Institution in Dublin, California ("FCI Dublin"), Health Services Administrator at Federal Correctional Institution in Dublin, California ("FCI Dublin"), and currently as Health Services Administrator in Los Angeles, California ("MDC Los Angeles"). I have been a licensed pharmacist in North Carolina since 2014. I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2. As a Health Services Administrator, I oversee clinical care for a full scope and range of medical services to inmates, supervising all Mid-Level Practitioners and other clinical personnel, maintaining the quality of medical records, examining and treating ambulatory patients, and referring inmates to outside specialists for further medical treatment. As part of my responsibilities as a Health Services Administrator, I am occasionally requested to provide information and assistance to United States Attorney's Offices in connection with ongoing civil and criminal litigation.

3. As part of my duties, I am thoroughly familiar with the health care and treatment available throughout BOP institutions and, more specifically, with the care and treatment that is available for inmates with different types of chronic medical conditions. I have prepared this declaration in response to a request by the Office of the United States Attorney regarding the medical conditions and care available for Samir Ousman Alsheikh, a defendant in United States v. Alsheikh, Central District of California, Case No. 2:24-cr-00483-HDV.

4. In preparing this declaration, I reviewed the Defendant's medical records, as provided through the Bureau Electronic Medical Records ("BEMR").

5. The medical records indicate that Mr. Alsheikh suffers from several medical problems, to include: (a) dental caries, (b) glaucoma, (c) chronic sinusitis, (d) gastro-esophageal reflux without esophagitis, and (e) back pain.

6. Based on my review of the records and without examining Mr. Alsheikh, if Mr. Alsheikh were to be sentenced to a term of imprisonment, the BOP could provide him with appropriate medical care and treatment for his medical conditions. Indeed, Mr. Alsheikh's medical conditions are not unusual in the BOP system. As discussed below, there are inmates who have similar conditions as Mr. Alsheikh's conditions. These inmates are often and may be designated to Care Level 2, 3, or 4 locations based on the frequency of clinical contacts, laboratory monitoring, and specialty evaluations. They may also be evaluated by a BOP contract cardiologist, neurologist, pulmonologist, or other specialist upon a consultation request and seen regularly by medical staff. Additionally, it is very likely that Mr. Alsheikh would continue to be able to take medication prescribed to him to treat his health issues while incarcerated.

**A. BOP Institution Classification System and Resources to Manage Inmates with Serious Medical Conditions**

7. Health Services credentialed healthcare providers conduct an initial screening assessment of each newly incarcerated inmate within 24 hours of arrival. The intake screening is performed to identify, including but not limited to, the following: urgent medical, oral, or mental health care needs; signs of acute intoxication or symptoms of withdrawal; restrictions on housing or work assignments; presence of transmissible infections; disabilities requiring further evaluation and potential accommodation; and medication and medication reconciliation. Health Services credentialed healthcare providers will perform a comprehensive physical assessment on each newly incarcerated inmate to assess, diagnose, and treat medical needs. All inmates will receive a health record review by a credentialed healthcare provider at screening, which will be co-signed by a Licensed Independent Practitioner (LIP). At the time of screening, the inmate will be scheduled to be evaluated by an Advanced Practice Provider (APP) or LIP within a 30-day

timeframe if no medical or mental health concerns are noted or within 14 days if chronic conditions, such as medical or mental health concerns, are noted. Care level classification for medical and mental health conditions is the process of classifying inmates' medical and mental health conditions so that the inmates can be assigned to the BOP institutions that can best meet their health care needs.

8. There are four levels in the BOP medical care level classification system. Each inmate and each institution are assigned a care level. Inmate care levels are determined by their medical and/or mental health needs and are based primarily on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as an inmate's functional capability. Institution care levels are based primarily on the clinical capabilities and resources of the institution and the surrounding community, as well as specific missions, i.e., dialysis, oncology, etc. These medical care levels include:

a. Care Level 1 institutions house essentially healthy inmates. These inmates are less than 70 years of age and are generally healthy. They may have limited medical needs that can be easily managed by clinician evaluations every 6-12 months.

b. Care Level 2 institutions accept inmates with chronic, but stable medical conditions. Care Level 2 facilities can provide inmates with routine, regularly scheduled appointments with clinicians for monitoring. Enhanced resources, such as consultation or evaluation by medical specialists, may be required from time to time.

c. Care Level 3 institutions manage inmates that are considered medically complex outpatients who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complication. Inmates designated as Care Level 3 may require assistance with some activities of daily living that can be accomplished by inmate companions.

d. The BOP's seven Medical Referral Centers (MRCs) are classified as Care Level 4 institutions. MRC's provide enhanced medical services and limited inpatient care. Inmates assigned to Care Level 4 institutions suffer from conditions that require 24-hour skilled nursing care or nursing assistance.

**B. Inmate Placement Process**

9. If sentenced to a term of imprisonment, Mr. Alsheikh will be assessed by BOP staff at the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas, to determine the appropriate institution to which he should be designated. In addition, given Mr. Alsheikh's medical conditions, the BOP's Office of Medical Designations and Transportation ("OMDT") may evaluate his medical status and current course of treatment. This medical evaluation will be done using all available information, including any letters or medical records submitted by Mr. Alsheikh, his treating physicians and/or his counsel. Further, the BOP encourages defendants like Mr. Alsheikh to bring their complete medical records with them at the time of their surrender. This process will ensure that defendant is sent to a facility able to accommodate his medical needs and that continuity of care will be provided.

10. From the information I have reviewed, I believe Mr. Alsheikh would likely be housed in a Care Level 2 facility, depending on the BOP's assessment of his medical conditions.

11. If at any time, including upon admission, the facility's medical staff determine that Mr. Alsheikh's medical condition requires a higher level of care, the institution's Health Services Unit will complete a Redesignation Referral Request in the electronic health record for consideration of transfer.

12. Because the exact designation decision considers the defendant's security classification, space availability and other correctional factors in addition to his medical conditions, I cannot precisely predict to which specific institution Mr. Alsheikh will ultimately be designated.

**C. Appropriate Monitoring of Defendant's Medical Status and Needs**

13. In my opinion, BOP facilities can provide Mr. Alsheikh with the necessary medical treatment and medications for his various conditions. The conditions described by Mr. Alsheikh, as documented in his medical records, are routinely managed by the BOP across the United States. Additionally, Mr. Alsheikh will likely require clinical monitoring to maintain stability and prevent complications, which the BOP is equipped to provide. Upon arrival at his

designated facility, Mr. Alsheikh will undergo an initial intake screening and medication reconciliation.

14. At his designated facility, Mr. Alsheikh will also be enrolled in appropriate Chronic Care Clinics so that his various medical conditions can be monitored closely, and so that he can be provided with any diagnostic tests or specialty referrals he needs. Chronic Care Clinics are a scheduling device implemented by the BOP to ensure that inmates with chronic medical conditions receive regular and routine medical assessments and monitoring without the necessity of going through the ordinary "sick call" appointment process. The frequency of Chronic Care Clinic follow-up is determined by the treating physician based on the inmate's clinical needs and follow-up care is communicated to the inmate's primary BOP APPr, who will provide care between physician encounters. High risk or medically complex chronic care inmates are seen more frequently in accordance with the physician's clinical judgment, in addition to or in conjunction with regular visits with their primary provider. In some cases, it is appropriate to assign an inmate to multiple Chronic Care Clinics if this allows better tracking for follow-up by outside specialists.

15. In addition, inmates can access medical care via the sick call appointment process. This process provides supplemental medical access to inmates already enrolled in a Chronic Care Clinic. Sick call is defined as an inmate-initiated request for care. The sick call complaints are to be made by the inmate in person. Inmates presenting with urgent conditions will be evaluated expeditiously, whereas inmates presenting with routine complaints will be scheduled for a reasonably future sick call appointment. Assessment, diagnosis, and treatment will be conducted by credentialed health services staff. An inmate who has regular medical appointments pursuant to a Chronic Care Clinic plan may appear at sick call for any routine problems or needs that arise in between regularly scheduled medical visits.

16. Additionally, the BOP has access to specialists that are available to treat Mr. Alsheikh's conditions if clinically indicated through a consultation request.

//

**D. Emergency Treatment**

17. As for immediate medical emergencies or urgent acute medical complaints, it is my experience that, the correctional setting is one that lends itself to quick response time. A BOP inmate is virtually never alone or unsupervised, as he might be while he is living in the outside community. An inmate would likely be living in either a dormitory setting with other inmates or in a housing unit assigned to a cell. In either case, he will be under the continual observation of correctional officers who are on duty around the clock. It is my experience that correctional staff routinely refer inmates with medical complaints to the institution's medical staff enabling a swift clinical determination as to the urgency of the complaint.

18. Correctional officers carry a "body alarm" that notifies the facility's control center of an emergency at the officer's location. For any medical emergency, Correctional Supervisors are trained to activate 911 in the absence of clinical staff during off-duty hours, even before notifying the on-call BOP physician. In addition, an inmate suffering from an emergent acute medical event which cannot be managed at the institution's health services may be transported by ambulance and admitted to the local hospital. On each shift, specific staff members are pre-designated to act as escorts during emergency transports, so that there will be no delay in transporting the inmate when the ambulance arrives. In short, the correctional setting facilitates, rather than interferes with, the immediacy of care an individual like defendant may require, because of the continual monitoring and availability of medical assistance for incarcerated inmates.

**E. Availability of Medications**

19. The medical documents indicate that Mr. Alsheikh is currently taking the medications, to include but not limited to, Brimonidine Tartrate Eye Drops, Cetirizine, Cholecalciferol, Cyanocobalamin, Famotidine, and Fluticasone Nasal Spray. All these medications, or equivalent formulary alternatives, are available through the BOP national formulary. While he would not be prescribed any supplements, he would be able to purchase them through commissary. I do not anticipate any problems in providing Mr. Alsheikh with any medication that is clinically indicated.

**F. Ability to Function**

20. Mr. Alsheikh claims that his medical condition would make functioning in custody challenging. In my experience, while initial adaptation can be difficult, inmates with similar conditions typically do well in custody due to the routine and structure provided. I believe Mr. Alsheikh would receive the necessary care to function effectively and does not appear to require 24-hour skilled nursing care. If sentenced, he would likely be placed in a Care Level 2 facility.

I declare under the penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief. Executed this 2nd day of September, 2026, in Los Angeles, California.

CDR CHARLES PARK, Pharm. D.
Health Services Administrator
Federal Bureau of Prisons,
U.S. Public Health Service Commissioned Corps

# EXHIBIT 14

Case 2:24-cr-00483-HDV Document 302 Filed 09/03/26 Page 97 of 110 Page ID #:3079



# Bouthaina Shaaban: The axis of resistance will determine the identity of the world in the future.

Thursday, October 27, 2016, 7:58 PM




Dr. Buthaina Shaaban, the political and media advisor to the Syrian presidency, affirmed that the sacrifices of the resistance axis in Syria have thwarted the West's plans there, and that this axis will determine the identity of the world in the future," stressing that the struggle must focus on resisting the Zionist occupation and its terrorist tools.

In a speech during the "Jerusalem, the Pulse of the Intifada" forum organized by the Jerusalem International Foundation, Syria branch, to commemorate the first anniversary of the Jerusalem Intifada, Dr. Shaaban said, "The late President Hafez

وكالة قدس نت للأنباء
Quds Net News Agency

and that they were a disaster for the Arab nation. Rather, he said it directly after the agreement... Today, we do not need 23 years, and President Bashar al-Assad did not need five or ten years to say that this war on Syria will determine the future of Arabism and the future of the world, and this is what we all see before us."

For his part, the Director General of the Jerusalem International Foundation, Syria Branch, Dr. Safir Ahmed Al-Jarad, stated that the launch of the Jerusalem Cultural Day activities and the commemoration of the first anniversary of the blessed Jerusalem uprising from Damascus, the capital of Arabism, comes as a confirmation of "the right of the Palestinian people to defend their causes and holy sites, and that holy jihad can only be against the Israeli occupation."

Al-Jarad explained that "the blessed Jerusalem uprising terrified and surprised the Zionist entity and came as a complete and comprehensive expression of the Palestinian youth's rejection of the arrogance of the occupying Zionists," stressing that "the uprising will continue in all its forms, spectrums and diversity, culturally, militarily and even economically."

For his part, Ziad Al-Saghir, Secretary of the Fatah Intifada Movement, affirmed in a speech to the attendees that "the Palestinian resistance factions are continuing their fight alongside the Syrian army, believing in the unity of destiny and that defending Syria in the face of this conspiracy is a defense of Palestine," considering that "the goal of this fierce war is to displace the Palestinian people by striking the Palestinian camps in Syria, in order to liquidate the Palestinian cause once and for all," pointing out "the necessity of continuing the engagement with the Zionist entity to reclaim all of Palestine."

Popular Struggle Front, said: "A year after the Palestinian uprising, the factions have strengthened their role and offered martyrs and wounded, and there are thousands of prisoners in the occupation's prisons." He emphasized that "the Palestinian factions, despite all the measures taken by the Zionist entity and the Palestinian Authority's security services, are still continuing their role, considering next year to be the year of Palestine on the centenary of the Balfour Declaration crime."

Abdul Majid said, "The Palestinian resistance factions and all honorable and sincere individuals have prepared themselves to make the second year of the Intifada distinctive, renewed, and capable of confronting all measures taken by the Zionist entity." He pointed out that the resistance factions do not rely on the influential leadership controlling the Palestinian arena, saying, "From our perspective, there is no hope in this leadership in light of the commitments made in Oslo. After 23 years of these agreements, we have reached the conviction that this leadership will not reconsider its policies or cancel its commitments to the enemy."

Abdul Majid emphasized that the mission of the resistance factions is to increase clashes and confrontations with the occupation and to hold events globally and on all intellectual and political levels, "and to prepare for escalating the confrontation with the occupation, whether in the Gaza Strip or the West Bank. We believe that the Palestinian leadership will not be able to take serious steps for review in order to correct the situation in the Palestinian arena. On the contrary, it is complicit with the enemy and the official Arab regimes in suppressing the Intifada and the resistance."

Source: Damascus – Quds Net News Agency – Naeem Ibrahim

## Main News



Tehran defies Trump's statements and threatens to expand the war and disrupt oil exports.



Iranian missiles and drones intercepted in several Gulf countries, resulting in casualties and material damage.



Trump's most prominent statements regarding the war on Iran and its approaching end

## Related news



Lazzarini to leave his post at the end of March: The United States has not yet clarified its vision regarding...



Minister Mu'ayyad Sha'ban: Israeli order to seize the antiquities of Sebastia

Case 2:24-cr-00483-HDV Document 302 Filed 09/03/26 Page 101 of 110 Page ID #:3083

Tuesday, March 10, 2026

وكالة قدس نت للأنباء
Quds Net News Agency

# EXHIBIT 15

HUMAN RIGHTS WATCH

**FEBRUARY 4, 2008**

# Syria: Opposition Activists Tell of Beatings in Interrogation

Authorities Should Release All 12, and Investigate Allegations of Physical Abuse
Published in

The Syrian government has arbitrarily detained at least 12 activists who attended a meeting of opposition groups in December, Human Rights Watch said today. The authorities should immediately release the detained activists, dismiss all charges against them, and promptly investigate credible allegations that State Security officials beat at least eight of the activists during interrogation.

The 12, including former member of parliament Riad Seif, have been detained as part of a government crackdown against individuals who attended a December 1 meeting of the National Council of the Damascus Declaration for Democratic Change (NCDD), an umbrella group of opposition and pro-democracy groups.

On January 28, the third investigative judge in Damascus, Muhammad Subhi al-Sa`ur, referred 11 of the detainees to prosecutors on politically motivated charges of "weakening national sentiment," "spreading false or exaggerated news which would affect the morale of the country," "membership in an organization formed with the purpose of changing the structure of the state," "inciting sectarian strife," and "joining a secret association."

"The Syrian authorities are treating these activists like criminals simply because they called for democratic and peaceful change," said Joe Stork, acting Middle East director at Human Rights Watch.

Eight of the 11 told the investigative judge that State Security officials beat them during their interrogation and forced them to sign confessions that they planned to take money from foreign countries in order to divide the country by giving the Kurds a separate state. The detainees' lawyers told Human Rights Watch that the activists told the investigative judge in their judicial questioning how they were punched in the face, kicked, and slapped by State Security officials.

One detainee, `Ali al-Abdullah, was transferred on January 28 to a medical examiner to check his complaint that interrogators had injured his ear. The doctor declined to issue a report, saying that he was not a specialist in ear injuries. No investigation was reportedly opened in the allegations of ill-treatment. The detainees' lawyers told Human Rights Watch that the investigative judge did not respond to their request to receive a copy of the interrogation that he conducted with the detainees.

The authorities are currently holding 10 of the detainees, including Riad Seif, in `Adra prison with common criminals. Fida' al-Hurani, the only woman in the group and the recently elected president of the NCDD, is in the women's jail in Duma, near Damascus. The 12th and latest activist to be detained, Talal Abu Dan, an artist and sculptor from Aleppo, has remained in the custody of State Security since he was called in for interrogation on January 30.

Since the activists' referral to jails in `Adra and Duma, their relatives have been able to visit the activists. Conditions of detention are harsh: prison authorities do not provide mattresses, and many of the activists are still wearing the same clothes since their arrest in December. According to relatives, they are allowed to pass money to the activists but no clothes. Lawyers that have seen the detainees told Human Rights Watch that some looked "weak and tired." Riad Seif, who suffers from prostate cancer and has a heart condition, was forced to sleep with a single blanket in the general hall of the prison, exposed to cold weather.

"Syrian prison authorities are mistreating these activists," said Stork. "These people should not be in prison in the first place."

**Background**

The government crackdown began on December 9 when State Security, one of Syria's multiple security agencies, began arresting some of the 163 activists that attended the National Council of the Damascus Declaration for Democratic Change (NCDD). A total of 40 NCDD members have been arrested and 12 remain in detention. The 12 who remain in detention are:

1. Walid al-Bunni, 44, physician
2. Yasser al-`Eiti, 40, physician and poet
3. Feda' al-Hurani, 51, physician
4. Akram al-Bunni, 51, writer
5. Ahmad To`meh, 51, dentist
6. Jabr al-Shufi, 60, Arabic-literature teacher
7. `Ali al-`Abdullah, 58, writer
8. Fayez Sarah, 58, writer and journalist
9. Muhammad Hajj Darwish, 48, businessman
10. Marwan al-`Ush, 52, engineer
11. Riad Seif, 61,former member of parliament
12. Talal Abu Dan, 55, artist and sculptor

Region / Country

- Middle East/North Africa
- Syria

**Source URL:** *https://www.hrw.org/news/2008/02/04/syria-opposition-activists-tell-beatings-interrogation*

# EXHIBIT 16

HUMAN RIGHTS WATCH

**SEPTEMBER 16, 2008**

# Syria: Joint letter calling for release of human rights and political activists

Published in

The Euro¬Mediterranean Human Rights Network, the Observatory for the Protection of the Human Rights Defenders (a joint program between the International Federation for Human Rights and the World Organisation against Torture), Human Rights Watch and Human Rights First express their deep concern about the arbitrary detention and unfair trial in Syria of 12 members of the National Council of the Damascus Declaration for Democratic National Change. The undersigned organizations urge the Syrian authorities to halt the trial and release immediately and unconditionally these 12 human rights and political activists.

Dr. Ahmad Tohme, Mr. Jaber al¬Shoufi, Mr. Akram al Bunni, Dr. Fida al¬Hurani, Mr. Ali al¬Abdullah, Dr. Walid al¬Bunni, Dr. Yasser Tayser Aleiti, Mr. Fayez Sarah, Mr. Mohammed Haj Darwish, Mr. Riad Seif, Mr. Talal Abu Dan and Mr. Marwan al¬Esh are all members of the National Council of the Damascus Declaration for Democratic National Change (NCDD), a collective opposition and pro¬democracy movement comprising more than 160 Syrian political activists, human rights defenders, intellectuals and artists.

The NCDD was established on 1 December 2007 as a follow¬up body to the Damascus Declaration for Democratic National Change of 16 October 2005. After publishing the National Council's Concluding Statement, the NCDD was subject to crackdown by the authorities. Starting on 9 December 2007, 40 of its members were arrested by the Syrian State Security Intelligence and placed in detention. Out of these 40, the above mentioned 12 remain detained.
On 28 January 2008, the 12 were brought before an investigative judge, on the basis of charges related to Syrian Criminal Code Articles 285 ("weakening national sentiments"), 286 ("spreading information known to be false or weakening national sentiment"), 306 (belonging to an "association that aims to change the economic or social structure of the State") and 307 ("any action, speech, or writing aimed at sectarian incitement or encouraging conflict among sects"). On 26 August 2008, the General Prosecutor confirmed the charges, while the defendants rejected all accusations, stating that Damascus Declaration's aim was to initiate a debate on a democratic and peaceful reform process in Syria.

Defense lawyers will speak at the next hearing before the First Instance Criminal Court scheduled for 24 September 2008. The verdict is expected to be announced a few weeks later. The 12 defendants face prison

terms of up to 15 years.

We, the undersigned organizations, recall that these 12 human rights and political activists, by signing the Damascus Declaration and taking part to the establishment of the National Council of the Damascus Declaration for Democratic National Change, have done nothing except peacefully exercise their fundamental rights as guaranteed by Syria's Constitution and international law. Amongst other provisions, Article 38 states that "Every citizen has the right to freely and openly express his views in words, in writing, and through all other means of expression". The trial taking place before the Damascus Criminal Court violates these constitutional guarantees.

We also fear that the 12 defendants will not benefit from their right to a fair trial. The provisions of the Penal Code articles are so vague and broad that they allow the authorities to use them to crack down on peaceful dissidents and human rights activists. Moreover, there are serious worries that the defendants have been and will be subject to ill¬treatment during their detention. Although eight of the defendants claimed to the investigating magistrate that they had been beaten during their interrogation and forced to sign false confessions, no independent investigation was ordered regarding their allegations; it is likely that the forced confessions will be used against them in court. More generally, the subordination of Syrian judges and prosecutors to the executive authorities and the lack of judicial independence leave us limited hope that this will be a fair trial conducted in accordance with international standards.

Finally, we are extremely concerned about the health of some of the defendants, who are denied access to proper medical attention: Mr. Riad Seif, Secretary General of the NCDD, suffers from prostate cancer and is refused access to adequate treatment; Dr. Fidaa al¬Horani, Chairwoman of the NCDD, is refused the medical attention required by her heart condition; Mr. Ali Abdallah, an independent journalist, has allegedly lost hearing in his left ear as a result of blows received during interrogation. On 28 January 2008, he was examined by a doctor who refused to issue a report and no medical treatment was granted since. Moreover, Mr. Ali Abdallah was transferred more than two months ago to the "disciplinary" wing of Adra prison under much harsher conditions as a punishment for having refused to stand up during an argument with a guard.

Therefore, we, the undersigned organizations, call upon the Syrian authorities to:

• Recall the charges and put an end to the trial before the Damascus Criminal Court against Dr. Ahmad Tohme, Mr. Jaber al¬Shoufi, Mr. Akram al Bunni, Dr. Fida al¬Hurani, Mr. Ali al¬Abdullah, Dr. Walid Bunni, Dr. Yasser Tayser Aleiti, Mr. Fayez Sarah, Mr. Mohammed Haj Darwish, Mr. Riad Seif, Mr. Talal Abu Dan and Mr. Marwan al¬Esh, and release them immediately and unconditionally;
• Until their release, guarantee and protect the 12 defendants' physical and psychological integrity in accordance with the UN Minimum Rules for the Treatment of Prisoners and ensure that proper, independent and swift investigation is made on the claims of ill¬treatment and forced confession put forward by them;

• In the event charges are not recalled, guarantee to the defendants a right to a fair trial before an independent and impartial court in conformity with Syria's own commitments, in particular Article 10 of the 1948 United Nations Universal Declaration on Human Rights and Article 14.1 to 14.5 of the 1966 United Nations International Covenant on Civil and Political Rights and ensure that the procedure is in conformity with the standards and principles adopted by the United Nations bodies, including the 1985 Basic Principles for the Independence of the Judiciary and the 1990 Guidelines on the Role of Prosecutors.

More generally, we urge the Syrian authorities to:

• Respect their human rights obligations as established by the UN Universal Declaration on Human Rights and enshrined in the international instruments ratified by Syria, in particular the International Covenant on Civil and Political Rights, and guaranteed by the Syrian Constitution; accordingly fully respect and protect the right of all citizens to enjoy in particular the freedom of expression and of association and the right to peaceful assembly;
• Comply with the provisions of the 1998 UN Declaration on Human Rights Defenders, especially its Article 1 ("Everyone has the right, individually and in association with others, to promote and to strive for the protection and realization of human rights and fundamental freedoms at the national and international levels") and Article 5 ("For the purpose of promoting and protecting human rights and fundamental freedoms, everyone has the right, individually and in association with others, at the national and international levels: (a) To meet or assemble peacefully; (b) To form, join and participate in non-governmental organizations, associations or groups; (c) To communicate with non¬governmental or intergovernmental organization").
• Accordingly, stop all harassment, intimidation, threats, and deliberate attacks including through judicial proceedings – against human rights defenders in Syria, and release immediately and unconditionally all those currently detained.
• Lift the state of emergency, repeal Syria's Emergency Law and amend all laws that criminalize the exercise of free expression and freedom of association, in order to conform to Syria's human rights commitments.
• Guarantee to all citizens an effective access to justice and the right to a fair trial before an independent and impartial tribunal.

We also call upon the European Union's institutions to:

• Communicate their strong disapproval of the trial of the 12 human rights and political activists to the highest levels of the Syrian authorities and ask them to halt the trial and release them immediately and unconditionally;
• Condition any further progress in their relations with Syria, in particular the entry into force of the Association Agreement concluded on 17 December 2004, on real and lasting improvements in Syria's human rights situation as well as on concrete and measurable commitments by Syria to further improve its policies in this field;

• Comply with their own human rights commitments in their relations with Syria, recalling that according to Article 6 of the Treaty on the European Union "The Union is founded on the principles of liberty, democracy, respect for human rights and fundamental freedoms and the rule of law" and that all policies and actions undertaken by the European Union's institutions have to be based on such principles;
• Comply with the provisions of the EU Guidelines on Human Rights Defenders when dealing with Syria.

Finally, we call upon all European Union's Member States to:

• Communicate their strong disapproval of the trial to the highest levels of the Syrian authorities and ask them to halt the trial and release the above mentioned 12 human rights and political activists immediately and unconditionally;
More generally,
• Condition any further progress in their bilateral relations with Syria on real and lasting improvements in Syria's human rights situation as well as on concrete and measurable commitments by Syria to further improve its policies in this field;
• Establish and maintain contact with the human rights defenders at risk in Syria in order to document human rights violations and provide support when necessary.

Kamel Jendoubi
EMHRN President

Human Rights First
Matthew Easton
Director – Human Rights Defenders Program

Sarah Leah Whitson
Executive Director
Middle East & North Africa Division
Human Rights Watch

Observatory for the Protection of Human Rights Defenders
Souhayr Belhassen Eric SOTTAS
FIDH President OMCT Secretary General
Region / Country

- Middle East/North Africa
- Syria

---

**Source URL:** *https://www.hrw.org/news/2008/09/16/syria-joint-letter-calling-release-human-rights-and-political-activists*