NINA MARINO, ESQ. (State Bar No. 142815)
COLLIN CATE, ESQ (State Bar No. 365876)
KAPLAN MARINO, PC
1546 N. Fairfax Ave.
Los Angeles, CA 90046
Tel: (310) 557-0007
Fax: (310) 861-1776
E-mail: marino@kaplanmarino.com
cate@kaplanmarino.com

Attorneys for Defendant
SAMIR OUSMAN ALSHEIKH

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SAMIR OUSMAN ALSHEIKH,<br>Defendant. | Case No. 24-CR-00483-HDV<br>**SAMIR OUSMAN ALSHEIKH POSITION RE: SENTENCING; EXHIBITS**<br>Honorable Hernan D. Vera<br>Date: September 17, 2026<br>Time: 1:30 p.m. |

PLEASE TAKE NOTICE that SAMIR OUSMAN ALSHEIKH, by and through his attorneys of record, NINA MARINO and COLLIN CATE, hereby submits his Position Re: Sentencing. Mr. Alsheikh's position is based on the attached memorandum and exhibits, the files and records in this case, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

Dated: September 3, 2026

Respectfully submitted,
KAPLAN MARINO, PC

/s/ Nina Marino
NINA MARINO
COLLIN CATE
Attorneys for Defendant
Samir Ousman Alsheikh

# TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS .......... 3

A. The need for the sentence imposed to provide the defendant with needed medical care and other correctional treatment in the most effective manner. .......... 3

1. Medical care .......... 3

2. Correctional treatment .......... 7

B. The history and characteristics of Samir Alsheikh. .......... 8

C. Amenability to deportation. .......... 14

D. Affording adequate deterrence to criminal conduct and protection of the public. .......... 16

1. General Deterrence .......... 16

2. Specific deterrence. .......... 17

3. The need to avoid unwarranted sentencing disparities. .......... 18

E. A sentence of five years is sufficient to achieve the remaining goals of sentencing. .......... 20

III. CONCLUSION .......... 20

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Mr. Alsheikh stands before the Court for sentencing on convictions for torture and immigration fraud. The Court must determine a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. 18 U.S.C. § 3553(a). In doing so, the Court must consider not only the offense conduct, but the whole person; a 74-year-old man with [redacted], and a deeply supportive family. The 52 letters submitted to the Court describe Mr. Alsheikh as a person of integrity, compassion, and generosity to his family and community, in stark contrast to the trial testimony, highlighting the positive character of Mr. Alsheikh that coexists with the offense conduct. (Ex. A, Letters.) After considering the Guidelines, the § 3553(a) factors, the exhibits filed herewith attesting to his significant medical and cognitive conditions, and the harsh conditions of his term of imprisonment, Mr. Alsheikh requests a sentence of five years. Such a sentence demonstrates respect for the gravity of the offense without overlooking the very real personal characteristics of Mr. Alsheikh, and the full impact of his chronic medical conditions, and is sufficient but not greater than necessary to achieve the goals of sentencing.

The Probation Officer performed a guideline calculation.[1] That calculation results in an effective life sentence for a 74-year-old man with no criminal history, who suffers from myriad chronic medical conditions, for criminal conduct that occurred over a three-year period in Syria 20 years ago. Because the calculated guideline sentence is greater than necessary to achieve the goals of sentencing, the Probation Officer recommends a downward variance and a sentence of 15 years. *See United States v. Booker,* 543 U.S. 220, 245-46 (2005); *see also United States v.*

---

[1] Mr. Alsheikh objects to the Probation Office's application of § 2A4.1 and takes the position that § 2A2.2 is the applicable guideline. That objection to the PSR was transmitted via letter to the Probation Officer, carbon copying the prosecution team, on August 21, 2026. (Ex. B, Probation Officer letter 8.21.26.)

*Christensen,* 732 F.3d 1094, 1101 (9th Cir. 2013) (holding that the sentencing court may determine the weight allotted to the various sentencing factors).

Mr. Alsheikh agrees with the Probation Officer's rejection of a guideline sentence and downward variance for the reasons stated in the Probation and Sentence Report ("PSR"). Mr. Alsheikh believes that a further downward variance is supported by the facts identified in the PSR as well as additional evidence not available to, or considered by, the Probation Officer, as set forth below and in the attached exhibits.

Specifically, as documented in the Expert Medical Declaration of Nicoletta A. Turner-Foster, M.D., ("Turner-Foster Declaration") due to staffing shortages, the Bureau of Prisons ("BOP") cannot be relied upon to provide continuous and coordinated care to Mr. Alsheikh without significant delay. (Ex. C, Turner-Foster Declaration.) Dr. Turner-Foster makes clear that because Mr. Alsheikh suffers from [redacted] as documented in the [redacted] Assessment prepared by Annette L. Ermshar, Ph.D., MSCP, ABPP ("Ermshar Assessment"), Mr. Alsheikh likewise cannot be relied upon to advocate for or manage his own care. (Ex. C, Ermshar Assessment, at Ex. C_000121, 000126.) This combination of factors will result in the BOP being unable to provide Mr. Alsheikh with proper or timely care, causing accelerated decline in his health and unintended increased suffering.

In addition, as set forth in the Declaration of Jack Donson, Executive Director of Federal Prison Education and Reform Alliance – PERA ("Donson Declaration"), Mr. Alsheikh's expected BOP security classification, his ineligibility for programming or early release – meaning he will serve 85% of the custodial time this Court imposes – the threats to his physical safety by other inmates, and the impact of his medical classification on his housing and medical care, will together result in a term of imprisonment that is harder and far more punitive than compared with the same time served by a younger, healthier, English speaking, documented person,

who is not at perpetual risk for violence. (Ex. D, Donson Declaration.) That trajectory will only decline as Mr. Alsheikh ages and his medical condition worsens. In other words, the longer the sentence, the more inordinately punitive the sentence.

The Court is also asked to consider Mr. Alsheikh's amenability to deportation. This amenability also supports a downward variance because the Syrian Transitional Government is unquestionably the most qualified authority to impose punishment for crimes found to have been committed against its citizens and has actively initiated the process of accountability against former Assad officials. The other sentencing factors, including specific and general deterrence, protection of the public, and the need to avoid unwarranted disparity, also support a five-year sentence.

## II. ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS

### A. The need for the sentence imposed to provide the defendant with needed medical care and other correctional treatment in the most effective manner.

#### 1. Medical care

The Probation Officer recognizes that to provide Mr. Alsheikh with the medical care he needs, a variance is warranted. The Probation Officer arrived at this conclusion without the benefit of the Turner-Foster Declaration, the Ermshar Assessment, or the Donson Declaration. These materials provide strong support for a greater variance than that recommended by the Probation Officer.

The medical Care Level BOP assigns to Mr. Alsheikh will impact his medical treatment. If Mr. Alsheikh is assigned a Care Level 2, as is expected, to receive adequate care will require significant coordination between BOP and treatment providers that Dr. Turner-Foster states has not occurred nor is likely to occur in the BOP setting: "[I]t is my opinion, to a reasonable degree of medical certainty, the Bureau cannot presently be relied upon to provide his required continuum of coordinated care consistently and without clinically significant delay." (Ex. C, at ¶¶ 84-85.)

Dr. Turner-Foster based her opinion on records demonstrating Mr. Alsheikh suffers from multiple medical conditions that require coordinated care among several medical specialties including [redacted]. (*Id*. at ¶ 20.) The doctor also makes clear that thus far, these medical issues remain unresolved due to the failure of staff to provide continuity of care. (*Id*. at ¶¶ 19, 36.)

Dr. Turner-Foster opines that there is a distinct difference between the *availability* of care and the *capability* of the BOP to provide care. Because Mr. Alsheikh suffers from "multiple chronic conditions requiring care among several specialties, completing one test or consultation does not necessarily complete the underlying episode of care." (*Id*. at ¶ 36.) Dr. Turner-Foster provides several examples in Mr. Alsheikh's records of failure to follow up with coordinated and consistent medical care. (*Id*. at ¶¶ 38, 63, 76, 82.) "The distinction between care provided and care clinically resolved is important. BOP clinicians treated several conditions, obtained diagnostic studies, prescribed medications, and arranged outside consultations. However, several clinically important recommendations remained pending without documented completion or a medically supportable alternative plan. For a patient requiring serial specialty care, that gap is clinically meaningful." (*Id*. at ¶ 42.) The doctor continues:

> Delay is particularly consequential in the [redacted] The cognitive findings heighten this concern because [redacted] may reduce Alsheikh's ability to retain instructions, remember appointments, or bring incomplete care back to staff attention.

(*Id*. at ¶ 43.)

Because Mr. Alsheikh cannot speak English and has [redacted], his ability to advocate on his own behalf and follow instructions given to him (particularly critical instructions given by BOP to inmates for safety and order) is further impaired. (*Id*. at ¶ 26.)

The gap between Mr. Alsheikh's need for coordinated care and the care he is likely to receive is largely attributable to widespread staffing shortages, which cause significant delays and interruptions. (*Id*. at ¶ 64.) Dr. Turner-Foster cites several OIG reports documenting failures to provide timely, consistent care and the consequences of those failures. (*Id*. at ¶¶ 66-68.) Donson likewise attributes the primary impediment to continuity of care to staffing shortages. (Ex. D, at ¶ 16.) He further notes that Lompoc FCI currently has 10 vacant healthcare services positions. (*Id*. at ¶ 18.)

For Mr. Alsheikh, given his age and multiple chronic medical conditions, these circumstances can have dire consequences. Mr. Alsheikh requires management of conditions through "diagnostic testing, specialty surveillance, [redacted] assessment, and repeated outside consultations." (Ex. C, at ¶ 70.) To accomplish this level of care for a Care Level 2 inmate, coordination must occur between BOP medical staff, outside specialists, BOP transportation and correctional officers, and interpreter services. (*Id*.) Donson notes that "[w]hen Mr. Alsheikh requires outside medical trips to sub-specialists, he will be transported by at least two correctional officers while he is shackled with handcuffs, a bell chain and leg irons. The logistical security coordination and limited staff resources, combined with medical professional availability, will make this process challenging if it can be accomplished at all." (Ex. D, at ¶ 19.)

It is important to emphasize how Mr. Alsheikh's [redacted] will have direct implications for his incarceration. Doctor Turner-Foster makes clear that due to Mr. Alsheikh's [redacted], specifically his [redacted] he will not be a reliable care partner on his own behalf to assist the BOP – a system already failing. (Ex. C, at ¶ 71.) Dr. Ermshar explains that [redacted]

[redacted]

In a custodial setting, his [redacted] will result in [redacted] This behavior may appear to be intentional evasiveness, lack of cooperation, or dishonesty when it is a direct result of [redacted] If BOP staff do not understand this distinction, it will jeopardize both his ability to receive and participate in his care, but also his perceived compliance with commands and directions, potentially resulting in disciplinary action.

Based on the expert opinions of Turner-Foster and Donson, the coordinated continuity of care that Mr. Alsheikh requires cannot be provided by BOP if he is classified as a Care Level 2 inmate, as these experts expect he will be so designated. If Mr. Alsheikh is later classified as a Care Level 3 inmate and transferred to a federal medical center (which is a high-security institution), he will be housed with high-security offenders which will expose him to additional safety risks. (Ex. D, at ¶ 15.) Donson also notes that the process by which an inmate is referred to a different facility can take months. (*Id.*)

As a Care Level 2 inmate, the time Mr. Alsheikh serves will be substantially harder time than the same time served by a younger, healthier, English-speaking inmate, or even compared to that of an inmate of Alsheikh's age suffering from one or two chronic conditions. What makes Alsheikh's circumstances so challenging is [redacted] and

Arabic language. As a Care Level 3 inmate, the time Mr. Alsheikh serves will also be substantially harder as he will be housed with a dangerous and violent inmate population and likely in a location isolated and remote from his family. (Ex. D, at ¶ 15.)

Incarcerating Mr. Alsheikh for an extended period will not provide medical care in the most effective manner.

**2. Correctional treatment**

To provide Mr. Alsheikh with correctional treatment in the most effective manner, a greater variance is also warranted. As Donson notes, rehabilitation is a major purpose of incarceration. (Ex. D, at ¶ 21.) The BOP assesses prisoner needs for inmate rehabilitation and according to Donson, Mr. Alsheikh only meets two of the 13 criteria requiring rehabilitation. (*Id.*) Accordingly, his imprisonment will only provide correctional treatment for the purpose of punishment and deterrence and not, as with other inmates, for the purpose of rehabilitation. Punishment for the sake of punishment has limited correctional treatment value for an aging 74-year-old man in poor health for conduct occurring in particularly limited circumstances that will never be repeated.

Because of Mr. Alsheikh's lack of immigration status and counts of conviction, he will not be housed in a prison camp. (Ex. D, at ¶12.) Rather, Mr. Alsheikh will at minimum be housed in a low-level security facility. (*Id.*) His immigration status also renders Mr. Alsheikh ineligible for programming and early release credits; thus, he will serve 85% of the custodial sentence this Court imposes. (*Id*. at ¶ 13.) And, because of the counts of conviction, while in BOP custody, Mr. Alsheikh will be at risk of assault and intimidation throughout his BOP custodial period. (*Id*. at ¶ 14.) At the conclusion of that incarceration, Mr. Alsheikh will be transported to an ICE facility where he will await deportation. (*Id*. at ¶ 13.)

Taken together, the correctional treatment Mr. Alsheikh will receive in prison will not be effective; it will be solely punitive. Punishment for the sake of victim

retribution lacking rehabilitative purpose is not effective correctional treatment and therefore the imposition of a sentence that exceeds five years does not meet this goal of sentencing.

**B. The history and characteristics of Samir Alsheikh.**

Section 3553(a)(1) requires the Court to consider the whole person -- their background, relationships, contributions, and life before and after the conduct at issue. *See* 18 U.S.C. § 3553(a)(1); *Pepper v. United States*, 562 U.S. 476, 488 (2011) (the sentencing inquiry must "ensure that the punishment will suit not merely the offense but the individual defendant"); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). The 52 letters submitted to the Court show that throughout his 74 years of life, Mr. Alsheikh has positively affected many of those who have known him. (Ex. A, Letters.) The letters describe him as a person of integrity, compassion, and generosity to his family and community. Those accounts stand in stark contrast to the government witnesses' trial testimony, underscoring the difficult sentencing determination before the Court.

Mr. Alsheikh was born on May 20, 1952, in the village of Bakseria in northern Syria. (PSR ¶¶ 108, 110.) His father, Ousman Alsheikh, passed away when Mr. Alsheikh was only five years old, leaving his mother to raise four young children under very difficult circumstances. (PSR ¶ 110.) After the death of his father, Mr. Alsheikh's mother and uncle married and moved to Damascus, leaving Alsheikh to live with his siblings and grandparents. (PSR ¶¶ 110, 112.) His family faced significant periods of financial strain and separation. (PSR ¶¶ 110, 112.) Losing his father at such a young age had a profound impact on his life and taught him the importance of resilience, family, and perseverance. (Ex. A, Rami Al Cheikh letter, at Ex. A_000002; Sara Alchikh letter, at Ex. A_000006.)

Mr. Alsheikh has described how growing up in a small, close-knit village had a lasting impact on his character. (PSR ¶ 111.) Life was simple, and people depended on one another, which instilled in him a commitment to treating those around him with respect, regardless of social status or background. (PSR ¶ 111.) He developed a deep appreciation for hard work and self-reliance while supporting and guiding his nine siblings and stepsiblings through difficult times, often with his mother and stepfather living and working hundreds of miles away. (PSR ¶¶ 111-113.)

The place and time in which Mr. Alsheikh grew up as a young Syrian man is significant to sentencing the whole person. Between 1952 and 1971, Syria was defined by extreme political volatility, shifting through multiple military dictatorships, a democratic interlude, a political merger with Egypt, and the eventual rise of the Ba'ath Party.[2] The relative calm that ensued when Hafez Al Assad seized power in 1971 was a welcome reprieve from the perpetual instability and insecurity that Mr. Alsheikh experienced as a young man growing up in Syria.[3] And while

---

[2] *See* BBC News, *Syria Country Profile*, https://www.bbc.com/news/world-middle-east-14703856 ("Modern Syria gained its independence from France in 1946, after which it saw considerable political instability with multiple military coups and coup attempts between 1949 and 1971. Between 1958 and 1961 it briefly joined with Egypt to form the United Arab Republic."); *see also* Britannica, *Syria—The Union with Egypt, 1958–61*, https://www.britannica.com/place/Syria/The-union-with-Egypt-1958-61 (describing Syria's entry into the United Arab Republic in 1958 under Ba'ath Party leadership and the dissolution of the union by coup in September 1961); *see also* Middle East Inst., *Syria's Heads of State Over the Past Century*, https://mei.edu/publication/syrias-heads-state-over-past-century/ (documenting that between Syrian independence in 1946 and Hafez al-Assad's military coup in 1970, there were sixteen transitions of power, seven of which occurred by military coup); *see also* Patrick Seale, *Asad: The Struggle for the Middle East* 83–97 (1988); Global Security, *Syria—History—Post Independence*, https://www.globalsecurity.org/military/world/syria/history-postindependence.htm ("A series of military coups, begun in 1949, undermined civilian rule.").

[3] *See* Raymond Hinnebusch, *Syria: Revolution from Above* 55–60 (2001) (describing how Assad's November 1970 "Corrective Movement" ended chronic political instability and was perceived domestically as restoring order); P.J. Vatikiotis, *Syria Under Asad, 1970–78: The Centres of Power*, 14 Gov't & Opposition 341, 341 (1979) (noting that Assad's coup "constituted the twenty-first change of government in the twenty-four years of the country's independence"); *see also* Britannica, *Syria—Emergence and Fracture of the Syrian Baʿath*, https://www.britannica.com/place/Syria/Emergence-and-fracture-of-the-

(continued…)

Hafez Al Assad, and later his son Bashar Al Assad, ruled Syria as a totalitarian regime, where acts of torture against its citizens were common, to Mr. Alsheikh, these culture-based norms exemplified the only kind of government he had ever known. At the age of 19, with a stable government in control for the first time in his life, Mr. Alsheikh took a job with the police academy, and that began his career path. In determining the appropriate sentence, the Court must consider the environment and influences that led to the offense conduct.

Mr. Alsheikh has no prior criminal history, no history of substance abuse, and no history of mental illness. (PSR ¶¶ 99-102; 126; 127.) He married his wife, Thanaa Masri, in 1983, and together they have raised four children: Kinda, Sara, Sally, and Rami, who are all between the ages of 30 and 40. (PSR ¶ 114.) Sara, Sally, and Rami reside in the United States, and Kinda resides in Syria. (PSR ¶ 114.) Several years ago, Thanaa was diagnosed with [redacted] and came to the United States for treatment. (PSR ¶ 115.) Sara, Sally, and Rami later moved to the United States and established successful careers, family relationships, and became valued members of their communities in South Carolina and California. (PSR ¶ 114.) Mr. Alsheikh has remained an active part of his children's lives, including the lives of his six grandchildren. (PSR ¶ 116.)

The reflections of his family and friends demonstrate Mr. Alsheikh's relationships with his family and his community. From his children's earliest memories, Mr. Alsheikh was a present and purposeful father and husband.

- His daughter Sally writes that he "firmly believed that education was the greatest gift a parent could give to a child" and "constantly reminded us that education is the greatest asset no one can ever take away from you."
- Mr. Alsheikh's wife, Thanaa Masri, describes their forty-year marriage: "Throughout our marriage, I have known Samir as a loving husband, a devoted

---

Syrian-Baath (describing Assad's seizure of power in November 1970 and formal installation as president on March 14, 1971).

father, a compassionate grandfather, and a man of kindness, honesty, and integrity. He has always been peaceful, kindhearted, forgiving, and respectful. In more than forty years of marriage, he has never hurt me with an unkind word. These qualities were not occasional acts of kindness; they were simply part of who he was every day of our life together."

His reputation for good character and respect extends beyond his children, to his friends, extended family, and others who readily acknowledge Mr. Alsheikh's penchant for good.

- Siham Bassal, a law graduate and friend of Mr. Alsheikh for more than fifty years, describes him as "a loyal friend, a devoted and caring husband, and a responsible father who dedicated himself to raising his children with the values of education, honesty, integrity, and respect for others." She observed that "his efforts have been reflected in the academic and professional success of his children, a source of pride for both him and his family."
- Mr. Alsheikh's sister, Safaa Al-Sheikh, stated that her brother "consistently provided both financial and emotional support to our family," and was "much more than a brother; he has been a source of support, assistance, and strength for our family for many years."
- His sister Elham Othman Al-Sheikh described how her brother helped her when her husband was seriously ill and her son was getting married. "Samir [] assumed all responsibilities as though he were the father of the groom, ensuring that the celebration proceeded smoothly and successfully." Elham further recounted that he "remained by the side of our sister, who became disable[d] following a car accident, from the day of her injury until her passing twenty years later. He never abandoned her."
- Mr. Alsheikh's son-in-law, Sofian Haikal, describes the time when Mr. Alsheikh's wife was diagnosed [redacted]. Mr. Alsheikh "remained in Syria caring for their four young children entirely on his own" for months while

his wife received treatment in the United States: "he devoted himself completely to raising them, managing the household, supporting their education – while his wife fought for her health across an ocean." Sofian writes: "That sacrifice, that steadiness in the face of hardship, reveals who he truly is."

Mr. Alsheikh possesses a strong faith that God protects and provides. This faith guides how he engages with family, friends and strangers.

- His daughter Sally recalls him being "awake since the early morning hours making phone calls and doing everything he could to find someone willing to donate the money needed" for a critically ill child's surgery. Sally writes: "That was not an isolated incident – it was simply who he was. He carried other people's pain as though it were his own and did everything in his power to help them". Even when their family did not have much, "if he met someone who was struggling, he never hesitated to help."
- His son Rami writes that his father once gave a man "everything he had at the time, which was about one or two months of his salary." Rami explains that his father "told us that story not to praise himself, but to teach us that when you help people sincerely, God does not forget." Rami adds that even now, strangers "still reach out to me and my family" to "tell us stories about how my father helped them, solved a problem for them, treated them with respect, or listened to them when no one else would."
- Mr. Alsheikh's daughter Kinda recalls that "on several occasions during the winter, he returned home without his jacket. We later learned that he had quietly given it to someone working with him who did not have adequate clothing for the cold." She also remembers him paying for a worker's journey home and giving additional money "so he could buy something for his family. He expected nothing in return."

Mr. Alsheikh's quiet generosity and altruism did not end when he left Syria. In 2020, upon his family's insistence, he chose to leave his Syrian homeland to join

his family in the United States. Here, he made contributions not only to his family but also to his local community.

- Mr. Alsheikh's neighbor in Lexington, South Carolina, Cheryl Keller, writes that she has "known Samir to be a kind and selfless individual." Despite a significant language barrier, she came to know him through acts like volunteering to care for her plants and quietly planting basil in an empty planter on her porch. Keller concludes: "The Alsheikh household is truly an asset and a bright spot in our community."
- Serene Ascha, a community member who has known Mr. Alsheikh for approximately six and a half years, writes that "what I have consistently seen in Samir is someone who is humble, generous, and genuinely good-natured." She observes that "his family – his children, their spouses, his grandchildren, and his wife – is the center of his world and the source of his greatest joy. This is not something he performs for others; it is simply who he is."

(Ex. A, Letters, *passim*.)

Since his incarceration in July 2024, Mr. Alsheikh has endured devastating loss; his sister – whom he described as his best friend -- two brothers-in-law, and his mother-in-law all passed away. (PSR ¶ 109.) He was unable to attend their funerals or provide support to his loved ones. Mr. Alsheikh reported that these losses, and his inability to be present with his family during them, have been "one of the most difficult experiences of his life." (PSR ¶ 109.) Further, his wife Thanaa continues to require ongoing medical treatment for [redacted]. (PSR ¶ 115.) Mr. Alsheikh has identified his wife as his main source of emotional support (PSR ¶ 116), and his separation from her during this time has caused him significant emotional pain and sadness. (PSR ¶ 126.) As Thanaa herself has written, the family "suffers" deeply from his absence, and their home "ha[s] not been the same without him." (Ex. A, Thanaa Masri Character Letter, at Ex. A_000014).

In addition, to the letters in support contained in Exhibit A, Mr. Alsheikh submits nine video statements as Exhibit E to this sentencing position.[4] The speakers include a criminal defense attorney, the Bishop of the Latin Apostolic Vicariate of Aleppo, a vocal member of the Syrian Opposition, an Islamic scholar and university professor, a former Adra prisoner, and Mr. Alsheikh's granddaughter. Their unique perspectives shed further light on Mr. Alsheikh's history and characteristics and provide further support for a downward variance. Mr. Alsheikh respectfully requests that the Court permit the submission and consideration of these videos at sentencing.

**C. Amenability to deportation.**

In considering Mr. Alsheikh's history and characteristics under 18 U.S.C. § 3553(a)(1), this Court may -- and should -- consider his amenability to deportation as a mitigating factor. Courts have recognized a sentencing court's discretion to weigh deportability in sentencing proceedings. The Ninth Circuit has held that a defendant's consent to deportation may serve as a basis for a downward departure under U.S.S.G. § 5K2.0, even over the government's objection, where it removes the case from the Guidelines "heartland." *See United States v. Rodriguez-Lopez,* 198 F.3d 773, 777 (9th Cir. 1999) (finding that the district court retains discretion to depart based on factors not adequately considered by the Sentencing Commission,

[4] Pursuant to the Court' standing order, Mr. Alsheikh respectfully requests permission to submit the nine character statement videos in support of his sentencing position. Each video is less than ten minutes in length; English transcripts have been prepared, and both the videos and transcripts have been provided to the government. (Ex. E, Character Videos & Transcripts.) Under 18 U.S.C. § 3661, the Court should consider broad information concerning a defendant's background and character, and no undue limitation should be placed on such a presentation. The provided video statements provide context on the history and characteristics of Mr. Alsheikh pursuant to § 3553(a)(1).

All nine speakers reside outside California and, with one exception, outside the United States. Travel to Los Angeles is impracticable because of expense, distance, and immigration-related obstacles; for those residing in Syria, significant connectivity issues and considerable time differences make recorded video statements the only feasible means by which they can be heard by the Court. These statements are not cumulative to the written submissions: none of the speakers is among the character-letter writers.

regardless of government consent).[5] Other circuit courts have confirmed that a defendant's deportable status is "entirely germane to the defendant's history" and its consideration is "explicitly required of the district judge under § 3553(a)(1). *United States v. Flores-Olague,* 717 F.3d 526, 535 (7th Cir. 2013); *see also United States v. Thavaraja,* 740 F.3d 253, 262-63 (2d Cir. 2014) (affirming a sentence of 108 months below the Guidelines where deportation's impact on the defendant was treated as a legitimate component of his individual history and circumstances).

Further, Mr. Alsheikh's deportation upon completion of his sentence is not speculative – it is a legal certainty. His conviction under 18 U.S.C. § 1425(a) triggers mandatory revocation of his lawful status, and he will be subject to the removal process under 8 U.S.C. §§ 1229 and 1231. *See United States v. Odeh,* 815 F.3d 968, 974 (6th Cir. 2016). In *United States v. Hercules,* the First Circuit upheld the district court's refusal to consider deportation precisely because the court found it was too uncertain whether the defendant would be deported as a result. *See United States v. Hercules,* 947 F.3d 3, 7-9 (1st Cir. 2020). Unlike in *Hercules*, where the First Circuit declined to treat deportation as a mitigating factor because it remained speculative, Mr. Alsheikh's deportation is not a matter of conjecture but an inevitability due to his conviction, and this Court should therefore give it appropriate weight at sentencing. Thus, Mr. Alsheikh's amenability to deportation and the certain nature of his deportation directly following completion of his sentence renders this a key consideration for this Court.

Mr. Alsheikh will be deported to Syria where the underlying conduct occurred and where he will be answerable for that conduct. The Transitional Government has established a National Authority for Transitional Justice specifically charged with uncovering violations committed by the former regime and coordinating efforts to

---

[5] In 2025, the Commission removed the departures based on specifical personal characteristics, however, the amendment was intended to be "outcome neutral, intending that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts" as the basis for a variance. U.S.S.G. ch. 1, pt. A, intro. cmt. (Nov. 1, 2025).

hold those responsible accountable.[6] Syria's own justice system is therefore best positioned to determine how to hold Mr. Alsheikh accountable, further demonstrating that a shorter sentence in the United States will accomplish the goals of sentencing.

**D. Affording adequate deterrence to criminal conduct and protection of the public.**

Section 3553(a)(2)(B) directs the Court to consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct," and § 3553(a)(2)(C) directs the Court to consider the need "to protect the public from further crimes of the defendant." Both considerations, properly applied to Mr. Alsheikh's circumstances, counsel against a lengthy custodial sentence.

**1. General Deterrence**

There is no general deterrent value to an extended period of incarceration in a case like this; a conviction for conduct that occurred decades ago under an authoritarian regime. *See* David Wippman, Atrocities, Deterrence, and the Limits of International Justice, 23 Fordham Int'l L.J. 473, 475 (1999) (finding that deterrence of atrocities is undermined by the low probability of prosecution, the obedience-to-authority dynamics driving foot soldiers, and the inability of international tribunals to reach senior political leaders responsible for state-directed violence); *see also* Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199

---

[6] Presidential Decree No. 20 of 2025 (Syria), translated in *Presidency of the Republic: Presidential Decree No. (20) Establishing the National Transitional Justice Authority,* Syrian Arab News Agency (May 17, 2025), https://sana.sy/en/syria/355958/?; *see also* Ghaith Alsayed, *Syria's First Public Trial of Assad-Era Officials Opens in Damascus,* Associated Press (Apr. 26, 2026), https://apnews.com/article/syria-trial-transitional-justice-assad-atef-najib-aff2f6c36a44d85006be6a15a4d6447f (reporting the opening of the first public trial of a former Assad-regime official, charges against other former high-ranking officials, and the arrest of a former intelligence officer accused of participating in a massacre); *Trial Week Opens for Assad-Era Figures, Including Syria's Former Grand Mufti Hassoun*, Asharq Al-Awsat (June 23, 2026), https://english.aawsat.com/arab-world/5287388-trial-week-opens-assad-era-figures-including-syria's-former-grand-mufti-hassoun (reporting several scheduled trials and government figures showing thousands of former military personnel and regime affiliates in detention).

(2013) (concluding that "the certainty of apprehension, not the severity of the ensuing legal consequence, is the more effective deterrent," and that "lengthy prison sentences and mandatory minimum sentencing cannot be justified on deterrence").

Therefore, the conviction itself – together with the public trial, the jury's unanimous verdict, and the mandatory denaturalization and deportation that will follow – delivers an unambiguous message that individuals who have participated in acts of torture abroad and who seek to conceal that participation through fraud upon our immigration system will be prosecuted. That message is conveyed with equal force by a sentence of five years as it would be by any greater sentence.

**2. Specific deterrence.**

The conduct at issue here was a function of a particular regime, a particular institution, and a particular window in time between 2005 and 2008. The nature and circumstances of the offense make clear that they are not replicable and there is therefore little need for specific deterrence. This insight has also been recognized at the war tribunal level. *Prosecutor v. Kunarac et al*., Case Nos. IT-96-23-T & IT-96-23/1-T, Trial Chamber Judgment ¶ 840 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 22, 2001)) ("[S]pecial deterrence, as a general sentencing factor, is generally of little significance before this jurisdiction. The main reason is that the likelihood of persons convicted here ever again being faced with an opportunity to commit war crimes, crimes against humanity, genocide or grave breaches is so remote as to render its consideration in this way unreasonable and unfair.") (available at https://www.icty.org/x/cases/kunarac/tjug/en/kun-tj010222e-6.htm).

To the extent he survives a lengthy term of imprisonment, Mr. Alsheikh will then be removed from the United States such that he can pose no danger here. Neither would he pose a danger in Syria, if deported there, where the Transitional Government seeks to hold former regime figures accountable.

**3. The need to avoid unwarranted sentencing disparities.**

Application of this principle to Mr. Alsheikh's case compels the conclusion that a sentence of five years is both reasonable and proportionate when measured against sentences imposed in other more egregious matters.

In the matter of *United States v. Viliena*, Mr. Viliena was convicted of three counts of visa fraud in violation of 18 U.S.C. § 1546(a) in the District of Massachusetts and sentenced to 9 years followed by three years of supervised release. *United States v. Viliena*, No. 1:23-cr-10074-FDS (Judgment, Dkt. 233) (D. Mass. June 13, 2025). His convictions arose from false statements on immigration forms in which he denied having "ordered, carried out or materially assisted in extrajudicial and political killings and other acts of violence against the Haitian people." *Id.* at Gov't Sentencing Mem., Dkt. 228 at 5.

The evidence presented to the jury over a lengthy trial established that Viliena, while serving as the elected Mayor of Les Irois, Haiti, and backed by the armed political group Korega, engaged in the following acts, including others:

- Led an armed group to the home of David Boniface and, in reprisal for Boniface's testimony at a judicial proceeding, participated in the killing of Boniface's younger brother, Ecclesiaste Boniface, whose skull was smashed with a large rock before a crowd of bystanders.
- Mobilized armed supporters to forcibly shut down a community radio station, during which attack he ordered an associate to shoot and kill Nissage Martyr; Martyr was shot in the leg, spent months in hospitals, and ultimately had his leg amputated above the knee. Martyr later died under mysterious circumstances the day after the filing of a civil case against Viliena in the United States.
- During the same radio station attack, grabbed and punched Juders Yseme, an 18-year-old student, who was then shot in the face with a shotgun, requiring months of intensive treatment including two surgeries to extract shotgun pellets,

leaving him permanently blind in one eye with shrapnel still lodged in his scalp and arms.

*See id.* at Gov't Sentencing Mem., Dkt. 228 at 3–5, Def. Sentencing Mem., Dkt. 230 at 2.

In addition to this trial evidence, the government's sentencing memorandum detailed further acts of violence by Viliena and his associates during his tenure as mayor, including the tying up and mutilation of an individual (whose ears were bitten and cut) and the arson of more than thirty houses belonging to political opponents. *See id*. at Gov't Sentencing Mem., Dkt. 228 at 8.

A civil jury found Viliena liable for the extrajudicial killing of Ecclesiaste Boniface and the attempted extrajudicial killing and torture of Juders Yseme and Nissage Martyr, awarding $11 million in punitive damages. *See id*. at Gov't Sentencing Mem., Dkt. 228 at 6. Thus, the lengthy *Viliena* sentence, while for counts of immigration fraud, was primarily to account for the relevant conduct of violence and political killings.

In stark contrast, the evidence presented against Mr. Alsheikh, while certainly serious, involved the mistreatment of prisoners within a custodial setting at the direction of the Assad regime. Unlike Viliena, Mr. Alsheikh did not order or engage in extrajudicial killing, maiming or arson.

Where the sentencing landscape already includes a directly comparable case involving demonstrably more violent conduct, albeit less serious charges, the Court must account for that benchmark. To impose upon Mr. Alsheikh a sentence substantially exceeding five years would create precisely the kind of unwarranted disparity that § 3553(a)(6) was designed to prevent. A defendant whose jury heard evidence of extrajudicial killings, public shootings, and the systematic use of armed political violence received nine years. A sentence that is the same or in excess for Mr. Alsheikh – whose alleged conduct, however serious, did not involve the killing

of any person – would be disproportionate and inconsistent with the principles embodied in § 3553(a)(6).

### E. A sentence of five years is sufficient to achieve the remaining goals of sentencing.

A sentence of five years followed by deportation to Syria reflects the seriousness of the offense without treating it as equivalent to the most egregious forms of violence the federal sentencing framework addresses. It promotes respect for the law: the conviction itself – together with the public trial, the jury's unanimous verdict, and the mandatory denaturalization and deportation that will follow – delivers an unambiguous message that the United States does not condone torture. And it provides just punishment: five years of particularly harsh conditions of federal imprisonment, followed by certain removal from the United States, and deportation to the country in which the acts occurred, a country specifically addressing these acts, is proportionate to the record before this Court.

## III. CONCLUSION

Considering th[redacted] conditions that Mr. Alsheikh suffers from, Mr. Alsheikh's time in custody will be measurably harder and inordinately punitive. The harsh conditions of confinement will only be enhanced by Mr. Alsheikh's offenses of conviction and immigration status. The over 60 letters and statements submitted to the Court describe a person with positive contributions to the world, distinct from the evidence at trial. Whatever moral weight this case carries in the broader arc of history — however much the world, or the victims, or the public might wish the sentence to "send a message" — that desire cannot be the foundation of a just sentence. *See Pepper v. United States*, 562 U.S. 476, 490 (2011). A sentence designed to "send a message" is a sentence imposed for someone other than the defendant, and that is precisely what the Guidelines and the statute forbid. The Court must assess Mr. Alsheikh as an individual: his age, his health, his history, his culpability, and the specific conduct

for which he stands convicted, to wrestle with what constitutes a sufficient but not greater than necessary sentence.

Mr. Alsheikh requests that the Court sentence him to a term of 60 months (five years) in custody, waive imposition of fine due to financial inability, direct the Probation Officer to provide BOP with the Ermshar Assessment and Turner-Foster Declaration, and recommend that Mr. Alsheikh be housed in FCI Lompoc. Such a sentence achieves the goals of sentencing.

Dated: September 3, 2026

Respectfully submitted,
KAPLAN MARINO, PC

_______/s/ Nina Marino__________
NINA MARINO
COLLIN CATE
Attorneys for Defendant
Samir Ousman Alsheikh