# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES | : | Case No.: 24-CR-00483-HDV |
| | : | |
| v. | | |
| | : | |
| SAMIR OUSMAN ALSHEIKH | : | Judge: HON. HERNAN D. VERA |

**DECLARATION OF JACK DONSON**

1. I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct. I submit this Declaration at the request of counsel for Mr. Alsheikh, to provide information relevant to his sentencing.

**STATEMENT OF EXPERTISE**

2. I am the Executive Director of the Federal Prison Education and Reform Alliance-PERA, a non-profit organization. We provide training, education and support to the federal justice community to impart a better understanding of federal prison policy and process for representation and advocacy. I have worked directly with federal offenders for over 38 years. I have been qualified as an expert witness several dozen times in accordance with Federal Rule 702 (*Daubert* Standards) and have testified in district courts throughout the country.

3. I was employed by the Federal Bureau of Prisons (BOP) for twenty-three years working in security classification, correctional programs and treatment. (Ex. A, CV.) During my career, I have worked directly with inmates and trained staff in my position as a Correctional Treatment Specialist (case manager & case management coordinator). I completed hundreds of case management related training courses, had full-time collateral administrative responsibilities as an annual training instructor, and conducted specialized training for case managers, counselors and correctional officers. I was also responsible for mentoring, local policy writing, conducting facility audits, and oversaw several institutional programs. I have worked in minimum (camp), low, medium, administrative (pre-trial and high security), and Witness Security (PCU) units. On several occasions, I was assigned to the BOP Philadelphia Regional Office (NERO) and the New York City Community Corrections Office (TDY). I have expertise with U.S. Parole Commission policy (Old Law) and complex BOP sentence computations. Prior to working for the federal government, I was employed in the Commonwealth of Pennsylvania as a Probation and Parole Officer where I prepared pre-sentence investigations, supervised the work-release program and managed a caseload of adult and juvenile offenders.

4. I actively follow policy initiatives and routinely attend training conferences, including the U.S. Sentencing Commission conference, which ordinarily includes a presentation by BOP staff on current prison issues. I am a member of the Corrections Committees of the

American Bar Association Criminal Justice Section (ABA-CJS) and National Association of Criminal Defense Lawyers (NACDL). I have authored articles, book chapters and op-eds on federal prison issues in national print media, legal periodicals and ABA publications.

5. My skillset is unique, policy-focused, and has been molded by my regular interaction with BOP staff and administrators, the broader federal justice community, and inmates housed in federal prisons throughout the country. In my role with FedCURE (www.fedcure.org) for over a decade, I regularly interacted with BOP central office staff regarding prison issues and was solicited for feedback on legislation such as the First Step Act. I have conducted First Step Act related training for the National Association of Criminal Defense Attorneys, the Administrative Office for the US Courts, and Federal Defender organizations. As a federal justice community stakeholder, I have attended meetings with the Government Accountability Office regarding the First Step Act and the DOJ for the access to justice and federal prison oversight initiatives.

6. I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer at Marywood University for several years and taught Criminal Justice courses, including one entitled The American Prison.

7. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

## SCOPE OF REVIEW

8. I have been asked to provide the Court with my professional opinion regarding Mr. Alsheikh's classification and the conditions he will face during a term of imprisonment. I have reviewed the PSR worksheet, Jury Verdict Form, First Superseding Indictment electronic bureau of prison's (BEMR) medical records, draft of the pre-sentence investigation report, recommendation letter from USPO Michelle Wang, and the medical declaration of Dr. Nicoletta Turner-Foster. I offer my opinion from a BOP correctional treatment perspective.

## SUMMARY OF FINDINGS

9. Based on a variety of factors, Mr. Alsheikh will be housed in a low-level security facility upon his entry into BOP custody. Mr. Alsheikh's lack of U.S. citizenship precludes designation to a minimum-security federal prison camp. This immigration status also makes him ineligible for any early release benefits, First Step Act time credits or residential re-entry (halfway house) placement. There is also the probability that he will remain in custody as an ICE detainee after the expiration of his sentence. His work history in a prison administration role and instant offense behavior will make him a target of assault and/or intimidation in prison. He is equally vulnerable from a medical care perspective because the BOP system is experiencing a historical medical staffing crisis which has impacted medical diagnosis and treatment. Should his medical condition continue to decline, and it is expected that it will, his medical needs will require that he be placed in a high-security institution. Lastly, because

Mr. Alsheikh does not meet the majority of the assessment criteria for rehabilitation, his imprisonment will be primarily for purposes of punishment and deterrence.

## SECURITY CLASSIFICATION (BRAVO)

10. The BOP classifies facilities into several categories including minimum security (camp), low and medium security (FCI's), high security (USP) and administrative (MCC/MDC/FDC & Medical Centers). The inmate classification tool is known as "BRAVO" (Bureau Risk Assessment Verification and Observation).

11. Some of the factors used in BOP classification include age, criminal history points, history of violence, and/or escape and characteristics of the instant offense. Each factor has a corresponding security point value, which is totaled to determine an overall security level and facility placement. Below is a chart based on the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification).[1]

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| HIGH | 24 + Points | 31 + Points |

12. Security points alone do not determine the level as BOP policy includes other public safety factors (PSFs) that elevate a security level despite the security points. Mr. Alsheikh will be assigned at least two, possibly three, PSFs including the "Alien" PSF because he is not a U.S. citizen, the "Greatest Severity" PSF because of the severity of the instant offense, and possibly the "Sentence Length" PSF. Inmates required to serve over 10 years cannot be classified lower than low security, over 20 years no lower than medium security, and over 30 years no lower than high security regardless of security points. I have calculated Mr. Alsheikh to have seven (7) security points based on the Probation Officer recommended sentence of 180 months which will result in his placement in a Low FCI.

## INELIGIBLITY FOR CAMP, RRC AND EARLY RELEASE BENEFITS

13. Because Mr. Alsheikh does not have legal status, he is not eligible for placement in a minimum security/camp facility. Mr. Alsheikh will also not be eligible for RRC (halfway house) placement which can be up to twelve (12) months.[2] The instant offense also makes him ineligible for First Step Act time credits which allow inmates to earn up to 15 days

[1] https://www.bop.gov/policy/progstat/5100_008cn.pdf
[2] https://www.bop.gov/policy/progstat/7310_004.pdf

additional credits per month for having a minimum or low risk for recidivism. Mr. Alsheikh will be required to serve eighty-five (85) percent of the full term of his sentence. Upon completion of his sentence, he will be transferred to an ICE detention center for deportation processing.

**SECURITY THREAT IN FCI**

14. Low FCI's contain inmates serving sentences over ten years, sex offenders, and others who have a criminal orientation. When new inmates arrive, they are approached by other inmates to "show their papers" in a sub-cultural inmate vetting process. This process is done to identify cooperators (aka: "rats") and sex offenders (aka: "chomos"). It is also to assess vulnerable inmates for financial extortion. When new inmates are unable to produce court documents, inmates will conduct Google and PACER searches to determine the nature of the offense and finances. Given the high-profile nature of this case and Mr. Alsheikh's convictions for torturing inmates when he was the director of a prison, he will be at risk for assault and intimidation. He may also be at risk for financial extortion.

**MEDICAL CLASSIFICATION AND IMPACT**

15. Dr. Turner-Foster's report, and her conclusion that Mr. Alsheikh will be designated a Care Level Two inmate, raises several concerns about his physical health during his term of imprisonment. As a Care Level Two inmate at a FCI, it will be difficult to manage his current conditions and obtain necessary diagnostic testing. Should Mr. Alsheikh's health continue to deteriorate, he will be moved to a federal medical center, institutions that also house high-security offenders, and could expose him to additional safety risks. The Court should also be aware that medical care levels are provisional at designation and do not become final until the individual arrives at the assigned facility and completes a medical screening and evaluation. If Mr. Alsheikh is later found to require a higher care level, the medical referral process could delay his transfer for months.

16. BOP health care staffing, for both medical and mental health professionals, is at critically low levels. Even before the Covid-19 pandemic, health care staffing was described by a former central office medical director as being at "crisis" levels.[3] Since the pandemic, BOP healthcare continues to be under the scrutiny of advocates, the DOJ Inspector General (DOJ-IG) and the courts. In October 2022, U.S. District Judge Roy B. Dalton stated in an order that the BOP "should be deeply ashamed" for what he called "its demonstrated contempt for the safety and dignity of the human lives in its care."[4] After Judge Dalton held the agency in contempt, the OIG launched an internal investigation of the BOP. Despite this oversight, Judge Dalton has determined on multiple occasions that the BOP has continued

[3] https://oig.justice.gov/reports/2016/e1602.pdf
[4] Devlin Barrett, Judge blasts Bureau of Prisons' treatment of dying prisoner, *Washington Post*, Oct. 14, 2022, https://www.washingtonpost.com/national-security/2022/10/14/prisons-contempt-dying-inmate/.

to fail to provide adequate medical care to inmates, as recently as April 2026, at which time he compared the provision of medical care to the "Soviet gulag."[5]

17. More recently, the DOJ-OIG released a report entitled Top Management and Performance Challenges Facing the Department of Justice[6] which indicated:

> In recent years, deficiencies in the provision of healthcare to inmates and sexual abuse of inmates by BOP staff have emerged as additional significant challenges. These issues detract from the BOP's mission to "foster a humane and secure environment and ensure public safety by preparing individuals for successful reentry into our communities," and they put inmates, employees, and the public at risk.

18. Even more recently, I had conversations with BOP staffers who confirmed the agency was losing both medical and psychology services staff at an alarming rate. Based on my independent research I have determined that FCI Lompoc, where I am recommending Mr. Alsheikh be designated based on location of his family, is down 10 healthcare services positions.

19. When Mr. Alsheikh requires outside medical trips to sub-specialists, he will be transported by at least two correctional officers while he is shackled with handcuffs, a bell chain and leg irons. The logistical security coordination and limited staff resources, combined with medical professional availability, will make this process challenging if it can be accomplished at all.

20. The BOP does not publish an estimate of the annual cost of medical center placement; however, I have reviewed recent statistics from the state of Massachusetts that reported an FY 2023 institutional cost of $96,372 per person. [7]

## CORRECTIONAL TREATMENT PROGRAMS

21. One of the major purposes of incarceration is rehabilitation. Under the First Step Act (FSA), staff identify the needs of offenders in a risk and needs tool referred to as the SPARC-13 (Specialized Prisoner Assessment for the Reduction in Criminality). Out of the thirteen risk/needs contained in the assessment, it is my professional opinion that Mr. Alsheikh only has two needs of the thirteen criteria specifically for medical and cognitions. The remaining eleven are: anger, anti-social peers, dyslexia, trauma, parenting, mental health, education, poverty, substance abuse, work & recreation/fitness. Given his age and minimal correctional

[5] https://www.notus.org/us-news/a-federal-judge-compared-the-u-s-prison-system-to-a-soviet-gulag-over-inmate-health-concerns

[6] https://oig.justice.gov/tmpc/challenge-1
[7] https://malegislature.gov/Bills/194/SD3267.pdf

treatment needs, there is little a custodial term can accomplish aside from punishment and deterrence.

## CONCLUSION AND RECOMMENDATION

22. Mr. Alsheikh will face many challenges during his incarceration. His lack of criminal history, instant offense behavior, lack of English language, age, and medical conditions will make imprisonment more punitive than for the typical inmate. He will be housed with violent offenders and will be subject to predation including assault and/or extortion given the nature of his offense. He will be incarcerated at a time of a historical staffing crisis in both correctional officers and medical positions. Any proactive medical diagnosis and treatment will likely be delayed, and his life expectancy may decrease. From a correctional treatment perspective, he has minimal rehabilitative needs making the only purpose of his incarceration punishment and deterrence under harsher conditions. A lengthy sentence will likely result in a higher classification increasing the likelihood that he would spend the rest of his life in jail under more dangerous conditions with inadequate health care.

23. It is my recommendation that Mr. Alsheikh be designated to FCI Lompoc, which is a care level two low security facility closest to his family for visitation purposes.

Executed on this 21st day of August 2026.




Jack T. Donson, Executive Director